**Goudyloch E. DYER et al., Plaintiffs,**

v.

**W. Robert BLAIR, Speaker of the Illinois House of Representatives,\* Defendant.**

**Dawn Clark NETSCH et al., Plaintiffs,**

v.

**William C. HARRIS, President of the Illinois Senate, and W. Robert Blair, Speaker of the Illinois House of Representatives,\* Defendants.**

**Nos. 73 C 1183, 74 C 2822.**

United States District Court,
N. D. Illinois, E. D.

Feb. 20, 1975.

---

\* We take judicial notice of the fact that W. Robert Blair has been succeeded by William Redmond as Speaker of the Illinois House of Representatives and that William C. Harris has been succeeded by Cecil Partee as President of the Illinois Senate for the 79th Session of the Illinois General Assembly. Our disposition of these cases makes it unnecessary for us to determine whether, if the mandatory injunctions requiring certification of the ratification of the Equal Rights Amendment during the 78th General Assembly sought in Count II of each Complaint were to be granted, Illinois law would permit the officers sitting during the 78th Session to so certify, or would require the current officers to perform these ministerial acts. Fed.R.Civ.P. 25(d)(1) would provide for the automatic substitution of these successors in office if such were necessary.

**1292**

See also, D.C., 390 F.Supp. 1287.

Roger Pascal, Martha M. Jenkins, Joseph R. Lundy, Chicago, Ill., for plaintiffs.

William J. Scott, Atty. Gen. of Illinois, Chicago, Ill., for defendants.

Schlafly, Godfrey & Fitzgerald, Alton, Ill., for amici curiae.

Before STEVENS, Circuit Judge, HOFFMAN, Senior District Judge, and PARSONS, District Judge.

## MEMORANDUM AND ORDER

STEVENS, Circuit Judge.

The question presented in each of these cases is whether action taken during the 78th General Assembly. of the Illinois legislature constituted "ratification" of the proposed Equal Rights Amendment to the United States Constitution within the meaning of article V of that instrument.[1] That amendment received a favorable vote of more than a majority but less than three-fifths of the members of each house of the Illinois legislature. The question arises because the precise meaning of the term "ratified" has not yet been given a federal definition, but the Illinois State Constitution, as well as a rule adopted by the Illinois House of Representatives and a ruling of the President of the Illinois Senate in the 78th General Assembly, have prescribed a three-fifths majority requirement for amendment to the federal Constitution.

We first more fully describe the manner in which the issue arose and identify the specific motions which are before us; we next explain why we believe the question is justiciable, notwithstanding defendants' argument that it is a "political question"; we then explain our understanding of the term "ratified" as used in article V; and finally we decide whether Illinois ratified the proposed Equal Rights Amendment during the 78th General Assembly.

1. U.S.Const. art. V:
 "The Congress, whenever two thirds of both Houses shall deem it necessary, shall propose Amendments to this Constitution, or, on the Application of the Legislatures of two thirds of the several States, shall call a Convention for proposing Amendments, which, in either Case, shall be valid to all Intents and Purposes, as Part of this Constitution, when ratified by the Legislatures of three fourths of the several States, or by Conventions in three fourths thereof, as the one or the other Mode of Ratification may be proposed by the Congress; Provided that no Amendment which may be made prior to the Year One thousand eight hundred and eight shall in any Manner affect the first and fourth Clauses in the Ninth Section of the first Article; and that no State, without its Consent, shall be deprived of its equal Suffrage in the Senate."

## I.

On March 22, 1972, Congress approved the proposed 27th Amendment to the Constitution and submitted it for ratification to the legislatures of the states:

*Resolved by the Senate and House of Representatives of the United States of America in Congress assembled (two-thirds of each House concurring therein),* That the following article is proposed as an amendment to the Constitution of the United States, which shall be valid to all intents and purposes as part of the Constitution when ratified by the legislatures of three-fourths of the several States within seven years from the date of its submission by the Congress:

"ARTICLE —

Section 1. Equality of rights under the law shall not be denied or abridged by the United States or by any State on account of sex.

"Sec. 2. The Congress shall have the power to enforce, by appropriate legislation, the provisions of this article.

"Sec. 3. This amendment shall take effect two years after the date of ratification."

H.J.Res. 208, 86 Stat. 1523 (1972).

Article XIV, § 4 of the Illinois Constitution of 1970 provided, for the first time,[2] explicit procedures for the Illinois General Assembly to approve amendments to the United States Constitution:

§ 4. Amendments to the Constitution of the United States

The affirmative vote of three-fifths of the members elected to each house of the General Assembly shall be required to request Congress to call a Federal Constitutional Convention, to ratify a proposed amendment to the Constitution of the United States, or to call a State Convention to ratify a proposed amendment to the Constitution of the United States. The General Assembly shall not take action on any proposed amendment to the Constitution of the United States submitted for ratification by legislatures unless a majority of the members of the General Assembly shall have been elected after the proposed amendment has been submitted for ratification. The requirements of this Section shall govern to the extent that they are not inconsistent with requirements established by the United States.

No action was taken on the ratification of E.R.A. by the Illinois House of Representatives during the 77th General Assembly, which expired on January 9, 1973. As Representative Juckett explained, this was in keeping with the "waiting period" provision of article XIV, § 4.[3] On May 24, 1972, however, the Senate of the 77th General Assembly did vote on Senate Joint Resolution 62, the E.R.A. The resolution received 30 affirmative votes with 21 members opposed and one voting "present," a constitutional majority[4] of the 59 Senate members but six votes short of three-fifths. The Journal of the Senate reports that, on this vote, "The motion prevailed and the resolution was adopted. Ordered that the Secretary inform the House of Representatives thereof and

---

2. *See* S.H.A.Const. art. XIV, § 4 (Constitutional Commentary) (1971).

3. *See* Transcript of Proceedings of Illinois House of Representatives, February 1, 1973, at 6, attached as Exhibit 1 to Affidavit of Joseph R. Lundy in Support of Plaintiffs' Motion for Summary Judgment and in Opposition to Defendant's Motion to Dismiss in *Dyer* (hereinafter referred to as "Lundy Affidavit").

4. Defendants describe a "constitutional majority" as a majority of the members elected to the respective house and entitled to vote. This is in contrast to a "simple majority"— a majority of those present and voting on the measure—and an "extraordinary majority" which requires some higher percentage of the elected members to pass a question. The three-fifths requirement in article XIV, § 4 is, thus, an extraordinary majority.

ask their concurrence therein." Journal of the Illinois Senate 6227 (1972).[5]

At the outset of the 78th General Assembly, on February 1, 1973, the Illinois House of Representatives adopted rules to govern the ratification of constitutional amendments. Rule 42 provided:

> 42. Resolutions Concerning Proposed Constitutional Amendments.
>
> (a) Resolutions proposing any changes in the Constitutions of the State of Illinois or the United States shall be so designated and numbered consecutively.
>
> (b) Such resolutions shall be read once in full and assigned to committee in the manner provided in Rule 31.
>
> (c) Such resolutions shall be read in full a second and third time on different days and reproduced and placed on the members' desks before the vote is taken on final passage.
>
> (d) No such resolution shall pass except upon an affirmative vote of 107 members.
>
> (e) The provisions of this rule may be suspended only upon an affirmative vote of 107 members.

An attempt on that date by Representative Catania, one of the plaintiffs herein, to amend Rule 42 to require only 89 votes, a constitutional majority, for the ratification of amendments to the federal Constitution was withdrawn and referred to the House Rules Committee.[6]

Subsequently, on April 4, 1973, House Resolution 176, which would have amended Rule 42 in that respect, was reported favorably by the Rules Committee, but was defeated by the full House 69–90.[7] Debate over this Resolution centered on an opinion that Illinois Attorney General William Scott had given then Speaker of the House W. Robert Blair on May 11, 1972, that article XIV, § 4 of the Illinois Constitution, insofar as it required both a three-fifths vote and a waiting period, was in conflict with articles V and VI of the federal Constitution and, consequently, of no effect.[8] Proponents of the amendment to Rule 42 relied heavily on this opinion.[9] Opponents felt

---

5. There is no explanation contained in the record of why S.J.R. 62 was deemed to pass with only a constitutional majority in light of the provisions of article XIV, § 4 of the Illinois Constitution. Thirteen days prior to this vote, however, Illinois Attorney General William J. Scott had given Senator Esther Saperstein and Speaker of the House W. Robert Blair his opinion that this extraordinary majority requirement was inconsistent with articles V and VI of the United States Constitution. Op.Ill.Att'y Gen. Nos. S–455, S–456 (1972). It is known that these opinions led the Senate to adopt Senate Rule 6, requiring only a constitutional majority to ratify an amendment, in early 1973. See p. 1298, *infra.*

6. *See* Transcript of Proceedings of Illinois House of Representatives, February 1, 1973, at 9, attached as Exhibit 1 to Lundy Affidavit; Journal of the Illinois House of Representatives 106 (1973).

7. *See* Transcript of Proceedings of Illinois House of Representatives, April 4, 1973, at 44–45, attached as Exhibit 2 to Lundy Affidavit; Journal of Illinois House of Representatives 775 (1973).

 Sixteen House members formally dissented from the failure of the House to adopt H.R. 176. Journal of Illinois House of Representatives 776–777 (1973).

8. Op.Ill.Att'y Gen. No. S–456 (1972). Attorney General Scott subsequently reiterated his conclusion that article XIV, § 4 of the Illinois Constitution was of no effect in his opinion of April 2, 1973, to W. Robert Blair (Op.Ill. Att'y Gen. No. S–571 (1973)). He also concluded that Ill.Rev.Stat.1971, ch. 7½, § 12 (Act of June 25, 1963, Laws 1963, p. 1215, § 1), which requires a favorable vote of a constitutional majority of each house to ratify a proposed federal Constitutional amendment, was in conflict with articles V and VI of the United States Constitution, since in enacting the act the legislature had acted in its state legislative rather than its federal amendment ratification capacity. Scott did conclude, however, that "barring the use of extreme standards patently in conflict with article V, each house may, by its own rules, determine how many votes are needed to ratify a proposed amendment to the United States Constitution." Op.Ill.Att'y Gen. No. S–571 (1973).

9. *See* remarks of Rep. Katz, Transcript of Proceedings of Illinois House of Representatives, April 4, 1973, at 8–13, 37–40, attached as Exhibit 2 to Lundy Affidavit; Rep. Wolfe, *id.* at 30–32; Rep. MacDonald, *id.* at 32–33; Rep. Ewell, *id.* at 41–42; Rep. Davis, *id.* at 42–44.

that the plain language of the Illinois Constitution must govern until such time as a court determined that such a conflict with the federal Constitution existed.[10]

Thus, on April 4, 1973, Speaker W. Robert Blair ruled that a three-fifths vote would be necessary to pass the resolution ratifying E.R.A. When that vote was taken that day, House Joint Resolution 14 received 95 votes, with 72 members voting "no" and 2 "present." Consequently, E.R.A. received more than the 89 votes necessary for a constitutional majority but fewer than the 107 votes needed to reach the three-fifths requirement. Blair ruled that the resolution had failed to pass.[11]

On May 8, 1973, four members of the House of Representatives filed the Complaint in case No. 73 C 1183 alleging, in Count I, that article XIV, § 4 of the Illinois Constitution was void and of no effect under articles V and VI of the federal Constitution. Plaintiffs sought the convening of a three-judge court, a declaratory judgment that the Illinois Constitution's three-fifths vote requirement was null and void and of no legal effect, and an injunction enjoining Blair from applying or enforcing article XIV, § 4. In Count II, plaintiffs alleged that the 107-vote requirement contained in House Rule 42(d) was derived from article XIV, § 4, and that that requirement was similarly void and unenforceable as in contravention of article V of the federal Constitution. As in Count I, the convening of a three-judge court, a declaratory judgment and a prohibitory injunction against Blair were sought. In

addition, however, plaintiffs sought a mandatory injunction directing Blair to sign, authenticate and certify the passage of House Joint Resolution 14, the E.R.A.

Defendant Blair, represented by Attorney General Scott, moved to dismiss the complaint alleging, *inter alia*, that plaintiffs lacked standing to bring the action,[12] that the court lacked jurisdiction over the subject matter and that suit could not be brought against the Speaker of the Illinois House of Representatives,[13] and that article V of the United States Constitution does not prescribe the manner in which a state legislature shall ratify proposed amendments to the Constitution. Plaintiffs moved for summary judgment on both counts of their complaint. Fifteen members of the Illinois House of Representatives sought leave to file a brief as amici curiae in opposition to plaintiffs' motion for summary judgment.

On May 21, 1974, after oral argument, we granted defendant's Motion to Dismiss and denied plaintiffs' Cross-Motion for Summary Judgment.[14] We concluded that the ratification process began anew with the convening of the 78th Session of the General Assembly, and that no action had been requested of, or taken by, the Illinois Senate during that Session. Thus, we held that the issue presented us by plaintiffs was not yet ripe for review.

Until the entire Legislature, including both of its Houses, has acted, the question whether its action, whatever form it may have taken when completed,

---

10. *See* remarks of Rep. Fleck, Transcript of Proceedings of Illinois House of Representatives, April 4, 1973, at 13–17, attached at Exhibit 2 to Lundy Affidavit; Rep. Hanrahan, *id.* at 18–20; Rep. Deuster, *id.* at 22–25; Rep. Duff, *id.* at 26–27; Rep. Day, *id.* at 27–29; Rep. Walsh, *id.* at 35–36; Rep. Laurino, *id.* at 40–41.

11. Journal of the Illinois House of Representatives 777–778 (1973).

12. We think plaintiffs' standing is adequately established by Coleman v. Miller, 307 U.S.

433, 437–446, 59 S.Ct. 972, 83 L.Ed. 1385, and Baker v. Carr, 369 U.S. 186, 204–208, 82 S.Ct. 691, 7 L.Ed.2d 663.

13. We find no tenth or eleventh amendment bar to these suits. Georgia R.R. & Banking Co. v. Redwine, 342 U.S. 299, 304, 72 S.Ct. 321, 96 L.Ed. 335; Ex Parte Young, 209 U.S. 123, 159–160, 28 S.Ct. 441, 52 L.Ed. 714.

14. In addition, we granted the motion of the amici curiae. Memorandum and Order, May 21, 1974, at 3 n. 3.

will constitute "ratification" cannot appropriately be addressed by us. Memorandum and Order, May 21, 1974, at 7.

On May 31, 1974, plaintiffs presented their first Motion to Vacate Order of May 21, 1974, and for Summary Judgment on Counts I and II, alleging that on May 21, 1974, Senate Joint Resolution No. 68 (E.R.A.) was introduced and voted on in the Illinois Senate.

President of the Senate William Harris, relying on article XIV, § 4 of the Illinois Constitution, ruled that an extraordinary majority of three-fifths would be required to adopt the resolution.[15] Earlier in the session, the Senate had adopted Senate Rule 6, which provided that "[a]ll resolutions proposing amendments to the United States Constitution . . . may be passed only on roll call by a majority of Senators elected." According to Senator Netsch, Rule 6 had been adopted in reliance on the aforementioned Illinois Attorney General Opinion.[16] At the conclusion of debate, a roll call vote on S.J.R. 68 was taken.[17] Before the results of the roll call were announced, however, Senator Saperstein, who had moved the adoption of the measure, moved to postpone consideration; the motion carried, and the Senate adjourned.[18]

We denied plaintiffs' Motion to Vacate in our Memorandum and Order of June 5, 1974, in light of the fact that no official vote of the Illinois Senate had taken place on May 21, 1974. We concluded that the issue presented remained nonjusticiable. Consequently, we did not reach that part of plaintiffs' motion that sought summary judgment.

On July 12, 1974, plaintiffs filed their second Motion to Vacate Order of May 21, 1974, and sought Summary Declaratory Judgment on Count I of their Complaint. They noted that on June 18, 1974, the Senate had officially voted on S.J.R. 68. The resolution received 30 votes, a constitutional majority, with 24 opposing votes, and one member voting present. As Senator Harris had once again ruled that a three-fifths vote (36) was required, however, the motion to adopt the resolution was recorded as lost.[19] Subsequently, plaintiffs moved for Expedited Consideration of their Motion to Vacate Order of May 21, 1974, and for Summary Declaratory Judgment on Count I of the Complaint.

We granted plaintiffs' Motion to Vacate Order of May 21, 1974, in a Memorandum and Order filed November 6, 1974, noting that the objection to ripeness had been cured by the June 18, 1974, Senate vote. We denied, however, the Motion for Expedited Consideration.

In the intervening period a second suit (No. 74 C 2822) was filed by two members of the Illinois Senate and the same four members of the Illinois House of Representatives. Speaker of the House Blair and President of the Senate Harris were named as defendants. Count I, virtually identical to Count I of the original suit, sought the convening of a three-judge court, a declaration that article XIV, § 4 of the Illinois Constitution is null and void and of no legal effect, and a prohibitory injunction enjoining Blair and Harris from applying or enforcing the constitutional provision. Count II similarly sought a three-judge court, a declaration that article XIV, §

15. Transcript of Proceedings of Illinois Senate, May 21, 1974, at 11, attached as Exhibit B to Affidavit of Cecil A. Partee in Support of Plaintiffs' Motion to Vacate Court's Opinion and Order of May 21, 1974, and for Summary Judgment in *Dyer* (hereinafter referred to as "Partee Affidavit"); Journal of the Illinois Senate 5 (May 21, 1974).

16. Transcript of Proceedings of Illinois Senate, May 21, 1974, at 11–12, attached as Exhibit B to Partee Affidavit.

17. Plaintiffs have informed us that S.J.R. 68 received 32 "yes" votes. Paragraph 4 of Partee Affidavit.

18. Transcript of Proceedings of Illinois Senate, May 21, 1974, at 57, attached as Exhibit B to Partee Affidavit; Journal of the Illinois Senate 5 (May 21, 1974).

19. *See* Journal of the Illinois Senate 21 (June 18, 1974).

4 and House Rule 42(d) are null and void and of no legal effect, a prohibitory injunction enjoining Blair and Harris from applying or enforcing article XIV, § 4 or Rule 42(d), and a mandatory injunction requiring Blair and Harris to sign, authenticate and certify the passage of H.J.R. 14 and S.J.R. 68, respectively.

On October 4, 1974, plaintiffs in *Netsch* filed a Motion to Convene Three-Judge Court and For Leave to File Instanter Plaintiffs' Motion for Partial Summary Declaratory Judgment on Count I of the Complaint. Defendants' response to Plaintiffs' Motion for Partial Summary Judgment was received, and on October 11, Judge Bauer granted the Motion to Convene Three-Judge Court. Subsequently, on October 21, 1974, it was ordered that this case be transferred to the three-judge panel that had the *Dyer* case under consideration. Plaintiffs filed a Motion for Expedited Consideration of Plaintiffs' Motion for Partial Summary Judgment, for Leave to File Certain Memoranda of Law, and to Set a Date for Oral Argument. Judge Hoffman, acting for the three-judge court, on October 21, 1974, took the Motion for Expedited Consideration under advisement, granted plaintiffs leave to file the memoranda, and denied the motion to set a date for oral argument.

Consequently, the following motions are as yet undecided in these two related cases: in *Dyer*, the Motion for Summary Declaratory Judgment on Count I of the Complaint; in *Netsch*, the Motion for Partial Summary Declaratory Judgment on Count I of the Complaint and the Motion for Expedited Consideration of the Motion for Partial Summary Judgment.

## II.

Defendants contend that these cases present a "political question," that is to say, a question which can only be answered by either the executive or the legislative branch of the Federal Government. The contention is supported by alternative arguments: first, that Congress has sole and complete control over the entire amending process, subject to no judicial review; and second, that even if every aspect of the amending process is not controlled by Congress, the specific issue raised in these cases is.

There is force to the first argument since it was expressly accepted by four Justices of the Supreme Court in Coleman v. Miller, 307 U.S. 433, 59 S.Ct. 972, 83 L.Ed. 1385.[20] But since a major-

20. The concurring opinion by Mr. Justice Black was joined by Justices Roberts, Frankfurter and Douglas. *See* 307 U.S. at 456, 59 S.Ct. 972. Justice Black concluded his opinion as follows:

"The process itself is 'political' in its entirety, from submission until an amendment becomes part of the Constitution, and is not subject to judicial guidance, control or interference at any point.

"Since Congress has sole and complete control over the amending process, subject to no judicial review, the views of any court upon this process cannot be binding upon Congress, and insofar as Dillon v. Gloss [256 U.S. 368, 41 S.Ct. 510, 65 L.Ed. 994] attempts judicially to impose a limitation upon the right of Congress to determine final adoption of an amendment, it should be disapproved. If Congressional determination that an amendment has been completed and become a part of the Constitution is final and removed from examination by the courts, as the Court's present opin-

ion recognizes, surely the steps leading to that condition must be subject to the scrutiny, control and appraisal of none save the Congress, the body having exclusive power to make that final determination.

"Congress, possessing exclusive power over the amending process, cannot be bound by and is under no duty to accept the pronouncements upon that exclusive power by this Court or by the Kansas courts. Neither State nor Federal courts can review that power. Therefore, any judicial expression amounting to more than mere acknowledgment of exclusive Congressional power over the political process of amendment is a mere admonition to the Congress in the nature of an advisory opinion, given wholly without constitutional authority." 307 U.S. at 459–460, 59 S.Ct. at 984.

Dicta in Luther v. Borden, 48 U.S. (7 How.) 1, 39, 12 L.Ed. 581, has been read to support Justice Black's position. *See* Clark, The Supreme Court and the Amending Proc-

ity of the Court refused to accept that position in that case, and since the Court has on several occasions decided questions arising under article V, even in the face of "political question" contentions,[21] that argument is not one which a District Court is free to accept. We therefore must consider whether this particular issue is a "political question" under the standards identified in cases such as Powell v. McCormack, 395 U.S. 486, 518–519, 89 S.Ct. 1944, 23 L.Ed.2d 491, and Baker v. Carr, 369 U.S. 186, 217, 82 S.Ct. 691, 7 L.Ed.2d 663, and in Chief Justice Hughes' opinion for the Court in Coleman v. Miller, *supra.*

■■ The text of the Constitution does not expressly direct Congress, rather than the judiciary, to interpret the word "ratified" as it is used in article V, or to decide whether a particular state has taken action which constitutes ratification of a proposed amendment.[22] Rather than relying on the "textual commitment" test for identifying a political question, defendants primarily suggest that the issue is one which may produce an unseemly conflict between coordinate branches of government unless we treat it as nonjusticiable.[23] We are persuaded, however, that this suggestion is foreclosed by the Supreme Court's rejection of a comparable argument in Powell v. McCormack, *supra.*

In that case the Court was requested to pass on the constitutionality of the refusal by the House of Representatives to seat the plaintiff, who had been duly elected from the Eighteenth Congressional District of New York, to serve in the 90th Congress. The refusal was not based on the plaintiff's failure to meet the requirements of age, citizenship and residence contained in article I, § 2 of the Constitution. The question whether the House could refuse to seat an elected representative on any ground presented, quite obviously, a far more dramatic potential for conflict between coordinate branches than does the question involved in this case. In the *Powell* case, after concluding that the "textual commitment" formulation of the political question doctrine did not bar federal courts from adjudicating the plaintiff's claim, the Court discussed other considerations as follows:

Respondents' alternate contention is that the case presents a political question because judicial resolution of petitioners' claim would produce a "potentially embarrassing confrontation between coordinate branches" of the Federal Government. But, as our interpretation of Art. I, § 5, discloses, a determination of petitioner Powell's right to sit would require no more than an interpretation of the Constitution.

---

ess, 39 Va.L.Rev. 621, 630 (1953). However, as we read the passage in question, the Court was focusing its attention on the process of amending state constitutions, rather than the federal Constitution.

21. The Solicitor General and Charles Evans Hughes, representing certain states as amici curiae (see Dodd, Amending the Federal Constitution, 30 Yale L.J. 321, 322, 323 (1921)) specifically raised the political question argument in the National Prohibition Cases, 253 U.S. 350, 381, 40 S.Ct. 486, 64 L.Ed. 946; the amici curiae brief in Hawke v. Smith (No. 1), 253 U.S. 221, 40 S.Ct. 495, 64 L.Ed. 871, also presented this issue (*see* Clark *supra* n. 20, at 628 n. 38).
 *See also* United States v. Sprague, 282 U.S. 716, 51 S.Ct. 220, 75 L.Ed. 640; Leser v. Garnett, 258 U.S. 130, 42 S.Ct. 217, 66 L.Ed. 505; Dillon v. Gloss, 256 U.S. 368, 41 S.Ct.

510, 65 L.Ed. 994; Hawke v. Smith (No. 2), 253 U.S. 231, 40 S.Ct. 498, 64 L.Ed. 877; Hollingsworth v. Virginia, 3 U.S. (3 Dall.) 378, 1 L.Ed. 644.

22. *See* L. Orfield, The Amending of the Federal Constitution 13 (1971).

23. They point to the danger of setting the federal judiciary and the federal and state legislatures "at constitutional loggerheads." Brief in Support of Motion to Dismiss in *Dyer* at p. 11. Any suggestion that the federal judiciary must avoid potential conflict with state legislatures over the proper interpretation of the federal Constitution is answered by the supremacy clause, article VI, cl. 2, and cases such as Gibbons v. Ogden, 22 U.S. (9 Wheat.) 1, 6 L.Ed. 23, and Baker v. Carr, 369 U.S. 186, 82 S.Ct. 691, 7 L.Ed.2d 663.

Such a determination falls within the traditional role accorded courts to interpret the law, and does not involve a "lack of the respect due [a] coordinate [branch] of government," nor does it involve an "initial policy determination of a kind clearly for nonjudicial discretion." Baker v. Carr, 369 U.S. 186, at 217, 82 S.Ct. 691, at 710 [7 L.Ed.2d 663]. Our system of government requires that federal courts on occasion interpret the Constitution in a manner at variance with the construction given the document by another branch. The alleged conflict that such an adjudication may cause cannot justify the courts' avoiding their constitutional responsibility. See United States v. Brown, 381 U.S. 437, 462, 85 S.Ct. 1707, 1722, 14 L.Ed.2d 484 (1965); Youngstown Sheet & Tube Co. v. Sawyer, 343 U.S. 579, 613–614, 72 S. Ct. 863, 898, 96 L.Ed. 1153 (1952) (Frankfurter, J., concurring); Myers v. United States, 272 U.S. 52, 293, 47 S.Ct. 21, 84 [71 L.Ed. 160] (1926) (Brandeis, J., dissenting).

Nor are any of the other formulations of a political question "inextricable from the case at bar." Baker v. Carr, *supra* [369 U.S.] at 217, 82 S.Ct. [691] at 710. Petitioners seek a determination that the House was without power to exclude Powell from the 90th Congress, which, we have seen, requires an interpretation of the Constitution—a determination for which clearly there are "judicially . . . manageable standards." Finally, a judicial resolution of petitioners' claim will not result in "multifarious pronouncements by various departments on one question." For, as we noted in Baker v. Carr, *supra,* at

211, 82 S.Ct. [691], at 706 it is the responsibility of this Court to act as the ultimate interpreter of the Constitution. Marbury v. Madison, 1 Cranch (5 U.S.) 137, 2 L.Ed. 60 (1803). Thus, we conclude that petitioners' claim is not barred by the political question doctrine, and having determined that the claim is otherwise generally justiciable, we hold that the case is justiciable.

395 U.S. at 548–549, 89 S.Ct. at 1978 (footnote omitted).

 The Court's reasoning in Powell v. McCormack requires a similar conclusion in this case. Decision of the question presented requires no more than an interpretation of the Constitution. Such a decision falls squarely within the traditional role of the federal judiciary to construe that document.[24] The possibility that such an adjudication may conflict with the views of Congress cannot justify the courts' avoiding their constitutional responsibility. As the Supreme Court pointedly noted in its citation of McPherson v. Blacker, 146 U.S. 1, 24, 13 S.Ct. 3, 36 L.Ed. 869, the possibility that action might be taken in disregard of a final judicial determination is an "inadmissible suggestion."

The strongest argument for regarding the issue presented by these cases as a "political question" rests on an asserted "lack of judicially discoverable and manageable standards for resolving it." *See* Baker v. Carr, 369 U.S. at 217, 82 S.Ct. at 710. That argument is buttressed by the holding in Coleman v. Miller, 307 U.S. 433, 59 S.Ct. 972, 83 L.Ed. 1385 that the question whether the lapse of 13 years between the proposal of an amendment and the favorable action by the Kansas legislature made the ratification ineffec-

---

24. Although the Court will treat a certification by a legislature that it has followed a prescribed procedure in the enactment of a bill into law as conclusively determining the facts certified, Field v. Clark, 143 U.S. 649, 12 S.Ct. 495, 36 L.Ed. 294, the question whether the procedure followed by Congress was the one prescribed by the Constitution is a question the Court will answer. *See* the first two conclusions announced in the National Prohibition Cases, 253 U.S. 350, 386, 40 S.Ct. 486, 64 L.Ed. 946.

tive was a "political question" to be finally determined by Congress.[25]

That holding was based on the absence of any acceptable criteria for making a judicial determination of whether the proposed amendment had lost its vitality through lapse of time. The Court noted that different periods might be reasonable for different proposed amendments and that varying economic or social conditions might support differing conclusions. Such considerations, although entirely acceptable as a predicate for decision by political departments of the government, might be wholly inappropriate as a basis for judicial decision.[26]

Although the issue in these cases is somewhat comparable to the lapse of time issue in *Coleman* in that the criteria for judicial determination are, perhaps, equally hard to find, the answer does not depend on economic, social or political factors that vary from time to time and might well change during the interval between the proposal and ratification. A question that might be answered in different ways for different amendments must surely be controlled by political standards rather than standards easily characterized as judicially manageable.

■ It is primarily the character of the standards, not merely the difficulty of their application, that differentiates between those which are political and those which are judicial. The mere fact that a court has little or nothing but the language of the Constitution as a guide to its interpretation does not mean that the task of construction is judicially unmanageable. Consider, for example, the Supreme Court's comments in Dillon v. Gloss on the problem of deciding whether or not a ratification was timely:

It will be seen that this article says nothing about the time within which ratification may be had . . . . Neither the debates in the federal convention which framed the Constitution nor those in the state conventions which ratified it shed any light on the question.

. . . . . .

That the Constitution contains no express provision on the subject is not in itself controlling [with regard to

---

25. In *Coleman* the Court also held that the question whether the ratification of a proposed amendment was effective notwithstanding a prior rejection by the Kansas legislature was a political question. The characterization of that question as political rested largely on historic precedent. The issue had previously been considered by Congress; the Supreme Court found no basis for judicial interference with a continuation of that procedure for resolving that issue.

"We think that in accordance with this historic precedent the question of the efficacy of ratifications by state legislatures, in the light of previous rejection or attempted withdrawal, should be regarded as a political question pertaining to the political departments, with the ultimate authority in the Congress in the exercise of its control over the promulgation of the adoption of the amendment." 307 U.S. at 450, 59 S.Ct. at 981.

That reasoning does not apply to the question presented in these cases. For we have found no historic precedent indicating that Congress has previously considered a claim that a state legislature had effectively ratified a proposed amendment notwithstanding a failure to obtain the favorable vote required by its own rules of procedure.

26. "Where are to be found the criteria for such a judicial determination? None are to be found in Constitution or statute. . . . In short, the question of a reasonable time in many cases would involve, as in this case it does involve, an appraisal of a great variety of relevant conditions, political, social and economic, which can hardly be said to be within the appropriate range of evidence receivable in a court of justice and as to which it would be an extravagant extension of judicial authority to assert judicial notice as the basis of deciding a controversy with respect to the validity of an amendment actually ratified. On the other hand, these conditions are appropriate for the consideration of the political departments of the Government. The questions they involve are essentially political and not justiciable. They can be decided by the Congress with the full knowledge and appreciation ascribed to the national legislature of the political, social and economic conditions which have prevailed during the period since the submission of the amendment." 307 U.S. at 453–454, 59 S.Ct. at 981.

merits]; for with the Constitution, as with a statute or other written instrument, what is reasonably implied is as much a part of it as what is expressed.

256 U.S. at 371, 41 S.Ct. at 511 (footnote omitted).

We are persuaded that the word "ratification as used in article V of the federal Constitution must be interpreted with the kind of consistency that is characteristic of judicial, as opposed to political, decision making. We conclude, therefore, that whatever the word "ratification" means as it is used in article V, that meaning must be constant for each amendment that Congress may propose. We turn, then, to the problem of ascertaining the meaning of that term.

### III.

 The power of a state legislature to ratify an amendment to the federal Constitution is derived from that instrument. By virtue of the supremacy clause in article VI,[27] it is clear that the legislature's ratifying function may not be abridged by a state. Mr. Justice Brandeis, speaking for a unanimous court in Leser v. Garnett, 258 U.S. 130, 42 S.Ct. 217, 66 L.Ed. 505, made this point abundantly clear.

The second contention is that in the Constitutions of several of the 36 states named in the proclamation of the Secretary of State there are provisions which render inoperative the alleged ratifications by their Legislatures. The argument is that by reason of the specific provisions the legislatures were without power to ratify.

But the function of a state Legislature in ratifying a proposed amendement to the federal Constitution, like the function of Congress in proposing the amendment, is a federal function derived from the federal Constitution; and it transcends any limitations sought to be imposed by the people of a state. Hawke v. Smith, No. 1, 253 U.S. 221, 40 S.Ct. 495, 64 L.Ed. 871; Hawke v. Smith, No. 2, 253 U.S. 231, 40 S.Ct. 498, 64 L.Ed. 877; National Prohibition Cases, 253 U.S. 350, 386, 40 S.Ct. 486, 588, 64 L.Ed. 946.

258 U.S. at 136–137, 42 S.Ct. at 217.

Quite clearly, therefore, if the federal Constitution specifies that ratification shall be accomplished in a particular way, or by a particular vote of a state legislature or a state convention, no state may superimpose a more stringent requirement on that federal specification. The difficulty presented by the cases before us, however, results from the fact that neither the Constitution itself, nor the record of the deliberations of the constitutional convention which drafted it, contains any unambiguous description or definition of what the state legislature must do in order to perform its federal ratifying function.

History teaches us that the framers of the Constitution were dissatisfied with the extraordinary difficulty of amending the Articles of Confederation.[28] Accordingly, there was extensive discussion and debate about article V of the new Constitution, but it is fair to state that such deliberation was concerned almost exclusively with the procedure for initiating proposed amendments,[29] or with

27. "This Constitution, and the laws of the United States which shall be made in Pursuance thereof; and all Treaties made, or which shall be made, under the Authority of the United States, shall be the supreme Law of the Land; and the Judges, in every State shall be bound thereby, any Thing in the Constitution or Laws of any State to the Contrary notwithstanding." Article VI, clause 2.

28. Article XIII of the Articles of Confederation provided for amendment whenever it

shall "be agreed to in a Congress of the United States, and be afterwards affirmed by the Legislatures of every State."

29. On May 29, 1787, Edmund Randolph proposed "that provision ought to be made for the amendment of the Articles of Union whensoever it shall seem necessary; and that the assent of the national legislature ought not to be required thereto." V J. Elliot, Debates on the Federal Constitution 128 (1845). On that same day Charles Pinckney submitted a plan for amendment under which the legisla-

the number of states which must express their assent to a proposal in order to make it effective.[30] We have found no evidence of any significant discussion about the procedure which a state legislature or state convention should follow in deciding whether or not to ratify a proposal.[31]

Congress is, of course, given the power to decide whether the ratifying process should be performed by state conventions or by state legislatures, and the Supreme Court has affirmed Congress' power to prescribe a time limit within which the ratifying process must be completed.[32] But the Constitution is totally silent with respect to the procedure which each state convention or each state legislature, as the case may be, should follow in performing its ratifying function.

There can be no doubt about the fact that the Constitution permits many aspects of the ratification procedure to be determined by representatives of the several states. As Professor Dodd has noted:

It should be remembered, however, that ratification is by state legislatures, and that although the state may not provide any other method of ratification or impose limitations upon the power to ratify, it does seem to be clearly within the power of the state through its constitution or otherwise

ture of the United States would call a convention if two-thirds of the states petitioned for one, or, alternatively, Congress, with the consent of two-thirds of each House, could propose amendments to the states for ratification. *Id.* at 132. Col. Mason supported Randolph's proposal that Congress play no role in the amending process "because they may abuse their power, and refuse their assent on that very account." *Id.* at 182. When, on August 6, 1787, the committee on detail reported a proposed draft of the Constitution, it provided that Congress must call a convention upon the application of the legislatures of two-thirds of the states. *Id.* at 381. Gouverneur Morris disagreed, arguing that "the legislature should be left at liberty to call a convention whenever they pleased." *Id.* at 498. After this proposed article had been approved and subsequently reconsidered, Roger Sherman suggested that the legislature be empowered to propose amendments to the states. *Id.* at 531. Consideration of the proposed article was postponed in order to take up the proposition of James Madison, that contained the following initiation procedure:

"The legislature of the United States, whenever two thirds of both Houses shall deem necessary, or on the application of two thirds of the legislatures of the several states, shall propose amendments to this Constitution. . . ." *Id.*

This was subsequently amended on the motion of Gouverneur Morris and Elbridge Gerry so as to require a convention on application of two-thirds of the states. *Id.* at 551. The resulting provision reads as article V does now.

30. Pinckney's original plan called for ratification by two-thirds of the legislatures of the states. V. J. Elliot, *supra* n. 29, at 132. In-

tervening drafts provided for the ratification of amendments by a national constitutional convention. *Id.* at 381. On September 10, 1787, when Roger Sherman proposed to amend the committee on detail draft to provide for an alternate means of ratification by state legislatures, James Wilson proposed that two-thirds of the states be required to assent. *Id.* at 531. That motion was defeated 5-6, at which time Wilson proposed three-fourths, which was agreed to. *Id.* Subsequently, on September 15, Roger Sherman moved to strike out the three-fourths requirement in favor of "leaving future conventions to act in this matter, like present convention, according to circumstances." *Id.* at 551. This was defeated 3-7, *id.*, resulting in the language currently found in article V.

31. In presenting the advantages of article V in The Federalist No. 43, Madison focused solely on the initiation procedure:
"That useful alterations will be suggested by experience, could not but be foreseen. It was requisite, therefore, that a mode for introducing them should be provided. The mode preferred by the convention seems to be stamped with every mark of propriety. It guards equally against that extreme facility, which would render the Constitution too mutable; and that extreme difficulty, which might perpetuate its discovered faults. It, moreover, equally enables the general and the State governments to originate the amendment of errors, as they may be pointed out by the experience on one side, or on the other." The Federalist No. 43, at 286 (Modern Library ed.) (Madison).

32. Dillon v. Gloss, 256 U.S. 368, 41 S.Ct. 510, 65 L.Ed. 994.

to determine what shall be the organization of the state's representative legislative body, and what shall be the quorum for action by that body. It, of course, also rests within the power of the state itself as to when regular or special sessions of the state's representative body shall meet, and as to how that representative body shall be organized. Dodd, Amending the Federal Constitution, 30 Yale L.J. 321 344–345 (1921).[33]

Arguably, the vote required to effectuate a ratification might be considered a procedural matter, comparable to the determination of a quorum, subject to control by the states. Alternatively, it can be argued with equal force that since the term must have a federal definition, and since the number of votes required to ratify is a matter of critical importance, that number must be set by federal law. Theoretically, the number might be determined by at least five different standards.

First, since the entire ratification process is not effective unless three-fourths of the state legislatures have concurred, it might be inferred that a comparable fraction of each body must support a ratifying resolution. Second, it might be thought that a lesser extraordinary majority—such as the Illinois three-fifths requirement—of the legislators elected and eligible to vote would be appropriate. Or, third, an extraordinary majority of the legislators present and voting could be required. Conceivably this latter extraordinary majority might be obtained more easily than the fourth alternative, a vote of 51% of the elected legislators, a constitutional majority. And fifth, as plaintiffs argue in this case, a simple majority, a majority of a quorum—or more precisely of the legislators present when a quorum is present—may suffice.[34]

The vote of the Kansas Legislature, which under the holding in Coleman v. Miller, 307 U.S. 433, 59 S.Ct. 972, 83 L. Ed. 1385, constituted an effective ratification, was 21 to 20. We may take it as decided, therefore, that an extraordinary majority is not *required* by federal law.[35] There is, moreover, some evidence

---

33. At page 65 of his treatise, The Amending of the Federal Constitution (1971), Professor Orfield made a similar observation: "As a minimum power the state could provide for the time and place of meeting of the legislature, whether it should be bicameral or unicameral, the number and election of its members, its organization and officers. The state could perhaps even abolish its legislature altogether, at least as far as Article Five is concerned, although such action might be regarded as a failure to maintain a republican form of government."

34. Professor Orfield notes: "Perhaps a simple majority of a quorum of each House is sufficient." Orfield, *supra* n. 33, at 66.

In addition, if the state legislature should decide to meet in joint session to consider the proposed amendment, numerous other possible standards, ranging from a simple majority of all members present to highly complex formulae designed to ensure that an amendment is not ratified solely on the votes of the members of one of the houses, present themselves.

A survey of the ratification majorities required by the states to adopt federal constitutional amendments, prepared by the Illinois Legislative Council, has been supplied us by the defendants. It reports that 24 states require a majority of the elected representatives (a constitutional majority); 17 states

require a majority of those present and voting (a simple majority); 3 states require a majority of those elected to the state senate and two-thirds of those elected to the state house of representatives; 2 states require two-fifths of the members elected and a majority of those voting; Louisiana requires a majority of those elected to the state senate and a majority of those present and voting in the state house; Tennessee requires a majority of the authorized membership of each house notwithstanding the possible existence of vacancies; Idaho requires two-thirds of those elected.

35. The fact that an extraordinary majority is not required does not, of course, indicate that such a majority may not be permitted. Moreover, the fact that there is no constitutional impediment to the utilization by the states of extraordinary majorities for various other purposes, such as the approval of bonded indebtedness, etc., as the cases cited by amici curiae hold (*see, e. g.*, Gordon v. Lance, 403 U.S. 1, 91 S.Ct. 1889, 29 L.Ed.2d 273; Brenner v. School District of Kansas City, Mo., 403 U.S. 913, 91 S.Ct. 2225, 29 L.Ed. 2d 692), does not shed any light on the permissibility of such a requirement in connection with the performance by a state legislature of its federal ratifying function.

that when article V was drafted the framers assumed that state legislatures would act by majority vote.[36] That evidence, like the text of article V itself, is equally consistent with the view that a majority of a quorum would be sufficient, or with a view that a majority of the elected legislators would be required. And, of course, it is also consistent with the view that the framers did not intend to impose either of those alternatives upon the state legislators, but, instead, intended to leave that choice to the ratifying assemblies.

■■■ This last view seems most plausible to us. If the framers had intended to require the state legislatures to act by simple majority, we think they would have said so explicitly. When the Constitution requires action to be taken by an extraordinary majority, that requirement is plainly stated.[37] While the omission of a comparable requirement in connection with ratification makes it quite clear that a bare majority is permissible, it does not necessarily indicate that either a simple majority or a constitutional majority must be accepted as necessary. We think the omission more reasonably indicates that the framers intended to treat the determination of the vote required to pass a ratifying resolution as an aspect of the process that each state legislature, or state convention, may specify for itself.

This conclusion is consistent with—though by no means compelled by—the underlying philosophy of the framers with regard to the respective roles of the central government and the several state governments. Madison expressed the

---

36. For example, during the Virginia Ratifying Convention Patrick Henry argued:

"[B]ut what is destructive and mischievous, is, that three fourths of the state legislatures, or of the state conventions must concur in the amendments when proposed! In such numerous bodies, there must necessarily be some designing, bad men. To suppose that so large a number as three fourths of the states will concur, is to suppose that they will possess genius, intelligence, and integrity, approaching to miraculous. It would indeed be miraculous that they should concur in the same amendments, or even in such as would bear some likeness to one another; or four of the smallest states, that do not collectively contain one tenth part of the population of the United States, may obstruct the most salutary and necessary amendments. Nay, in these four states six tenths of the people may reject these amendments . . . . A bare majority in these four small states may hinder the adoption of amendments . . . ." Quoted in III J. Elliot, *supra*, n. 29 at 49–50.

Similarly, during the debates in the House on the proposed Bill of Rights, Representative Tucker remarked:

"I conceived it difficult, if not impossible, to obtain essential amendments by the way pointed out in the constitution. . . . It will be found, I fear, still more difficult than I apprehended; for perhaps these amendments . . . will be submitted for ratification to the Legislatures of the several States, instead of State conventions, in which case the chance is still worse. The Legislatures of almost all the States consist of two independent, distinct bodies; the amendments must be adopted by three-fourths of such Legislatures; that is to say, they must meet the approbation of the majority of each of eighteen deliberative assemblies." Quoted in 2 B. Schwartz, The Bill of Rights: A Documentary History 1115 (1971).

37. Two-thirds of the members present in the Senate are required to convict in an impeachment proceeding (art. I, § 3). Two-thirds of the members of the House or Senate are required to expel a member (art. 1, § 5). Two-thirds of the members of each house are necessary to override a Presidential veto (art. I, § 7). Two-thirds of the members of the Senate concur in the making of all treaties (art. II, § 2). Two-thirds of both houses are needed to propose constitutional amendments, and the legislatures or conventions of three-fourths of the states must ratify such (art. V). If a Presidential election is decided in the House of Representatives, a quorum consists of a member or members from two-thirds of the states (amend. 12). Similarly, two-thirds of the members of the Senate constitute a quorum for the selection of a Vice-President (*id.*). A vote of two-thirds of each house may remove the disability imposed on persons having engaged in rebellion or insurrection (amend. 14, § 3). A two-thirds vote of both houses is required to determine that the President continues to be unable to discharge the powers and duties of his office (amend. 25).

thought in urging ratification of the Constitution in The Federalist No. 45:

The powers delegated by the proposed Constitution to the federal government are few and defined. Those which are to remain in the State governments are numerous and indefinite.

The Federalist No. 45, at 303 (Modern Library ed.) (Madison). The ratifying power did not, of course, "remain in the State governments" because it was created by article V of the new Constitution. But the failure to prescribe any particular ratification procedure, or required vote to effectuate a ratification, is certainly consistent with the basic understanding that state legislatures should have the power and the discretion to determine for themselves how they should discharge the responsibilities committed to them by the federal government.[38]

In addition, were we to conclude that article V does mandate a particular majority vote in each state legislature, we would then have to choose among the myriad of possibilities set forth above. The fact that the several states have actually adopted a wide variety of ratification requirements (see n. 34, supra) demonstrates that no one voting percentage or procedure is manifestly preferable to all others. Moreover, this history manifests a common understanding that there is no federal objection to the state legislatures' independent determination

of their own voting requirements. The absence of criticism of this independent action throughout our history strongly suggests that the common understanding existed when the original Constitution was ratified and that the framers did not intend to prescribe any one of the various alternatives as mandatory.

Plaintiffs in the cases before us have argued that ratification under article V requires the use of a simple majority, or, at most, a majority of those entitled to vote, a constitutional majority. We find no principled reason for holding that either of those procedures, rather than any of the supermajority hybrids that have emerged since article V was adopted, is the one mandated by the Constitution.[39]

Article V identifies the body —either a legislature or a convention— which must ratify a proposed amendment. The act of ratification is an expression of consent to the amendment by that body. By what means that body shall decide to consent or not to consent is a matter for that body to determine for itself. This conclusion is not inconsistent with the premise that the definition of the term "ratified" is a matter of federal law. The term merely requires that the decision to consent or not to consent to a proposed amendment be made by each legislature, or by each convention, in accordance with procedures which each such body shall prescribe.[40]

38. At the time the framers inserted the provision empowering the legislatures of two-thirds of the states to apply to Congress for the calling of a convention to propose amendments, James Madison noted that no mention was made of the procedures that would govern the activities of such a convention. "[D]ifficulties might arise as to the form, the quorum, &c. which in constitutional regulations ought to be as much as possible avoided." V J. Elliot, supra, at 551. Nevertheless, no change in the language of article V was made; presumably, such procedural matters were left to be determined by such a convention itself.

39. Indeed, the alternative character of plaintiffs' argument implicitly acknowledges that

there may be more than one permissible voting procedure; such an express acknowledgment would, of course, undermine their argument that the constitutional interest in national uniformity requires that all ratifying resolutions pass muster under precisely the same voting standard. And, to the extent that plaintiffs would accept the more stringent requirement of a constitutional majority, they must recognize that in some cases it may in fact be easier to obtain a supermajority of those present and voting than 50% plus one of those elected and eligible to vote.

40. This is not to suggest that we would entertain a cause of action attacking a state ratification certification on the grounds that the legislature had failed to comply with its

**1308**

IV.

■ The Supreme Court has held that a state may not inhibit its legislature's federal power to ratify a proposed amendment to the United States Constitution by requiring approval at a popular referendum;[41] it seems equally clear that a state constitution may not require that a new legislature be elected before the proposal may be considered.[42] The Illinois Attorney General has on three occasions expressed the opinion that a due regard for the federal character of the legislature's ratifying function must invalidate the Illinois constitutional requirement of a favorable vote by a three-fifths majority. *See* nn. 5, 8, *supra*.

■ The Attorney General's analysis is consistent with ours. We have concluded that article V delegates to the state legislatures—or the state conventions depending upon the mode of ratification selected by Congress—the power to determine their own voting requirements. The decisions of the Supreme Court, as well as the text of article V, illuminate the critical point that the delegation is not to the states but rather to the designated ratifying bodies. We do not believe that delegated federal power may be inhibited by a state constitutional provision which, in practical effect, determines whether votes of legislators opposing an amendment shall be given greater, lesser, or the same weight as the votes of legislators who favor the proposal.

In the 77th General Assembly the Illinois Senate took the position that, in

the performance of its federal function, it was not inhibited by article XIV, § 4 of the Illinois Constitution and formally recorded its favorable action on the proposed Equal Rights Amendment notwithstanding the failure to obtain a three-fifths vote. In the 78th General Assembly, however, the House as well as the Senate took a different view. If our analysis of the nature of the delegated power is correct, the Illinois constitutional provision may only be precatory in its effect on the federal process, and those bodies are free to accept or to reject the three-fifths requirement.

■ They did accept that requirement during the 78th General Assembly. Whether they did so because of a mistaken understanding of the applicable law (notwithstanding the advice of the Attorney General of the state that they were free to disregard the limitation), or because of their decision to respect a policy choice made by the framers of their own constitution in 1970, or simply because they independently determined that the supermajority requirement would be desirable, is of no legal significance. It is clearly not our province to inquire into the individual motives of the legislators who voted in favor of the procedural rules adopted by each branch of the General Assembly to govern its own deliberations, including those relating to ratification of a proposed amendment to the federal Constitution.[43]

■ In sum, we conclude that the action taken by the 78th Session of the Illinois General Assembly did not con-

---

own procedures. As the Court stated in Leser v. Garnett, 258 U.S. 130, 137, 42 S.Ct. 217, 218, 66 L.Ed. 505:

"As the legislatures of Tennessee and of West Virginia had power to adopt the resolutions of ratification, official notice to the Secretary [of State], duly authenticated, that they had done so, was conclusive upon him, and, being certified to by his proclamation, is conclusive upon the courts."

41. Hawke v. Smith (No. 1), 253 U.S. 221, 40 S.Ct. 495, 64 L.Ed. 871; National Prohibition Cases, 253 U.S. 350, 40 S.Ct. 486, 64 L.Ed. 946.

42. Indeed, such a provision in the Tennessee Constitution was held unconstitutional in Leser v. Garnett, 258 U.S. 130, 136–137, 42 S.Ct. 217, 66 L.Ed. 505. One of the unenumerated state constitutional provisions at issue therein was that of Tennessee. *See* Leser v. Garnett, 139 Md. 46, 114 A. 840, 846–847 (1921).

43. *See* Palmer v. Thompson, 403 U.S. 217, 224–225, 91 S.Ct. 1940, 29 L.Ed.2d 438; United States v. O'Brien, 391 U.S. 367, 382–384, 88 S.Ct. 1673, 20 L.Ed.2d 672; Fletcher v. Peck, 10 U.S. (6 Cranch) 87, 130, 3 L.Ed. 162.

stitute an effective ratification because the resolution did not pass by the vote required by the applicable rules of procedure adopted by both houses of the legislature. This conclusion does not reflect disagreement with the contention of the plaintiffs, or the thrice-expressed opinion of the Attorney General of Illinois, that article XIV, § 4 of the Illinois Constitution of 1970 does not impose a valid restraint on the power of any session of the Illinois General Assembly to determine for itself the number of affirmative votes which will be required to ratify a proposed amendment to the Constitution of the United States.

The motions which are pending and undecided would not dispose of the entire litigation. It is apparent, however, that the record is now complete and no useful purpose would be served by further proceedings. Moreover, we are satisfied that further briefing of the legal issue would not modify the conclusion to which our research has led us. It therefore seems appropriate to enter final judgment disposing of the entire litigation.

 The three-judge court was convened in each of these cases because each complaint prayed for the entry of an injunction commanding state officials to take certain action predicated on the assumption that the Illinois legislature has effectively ratified the Equal Rights Amendment.[44] We have concluded that plaintiffs are not entitled to such injunctive relief. The reasoning which led us to that conclusion has required us to express an opinion concerning the legal import, or lack thereof, of article XIV, § 4 of the Illinois Constitution. Since the ultimate decision of the controversy between the parties is controlled by the legislature's procedural rules, and, in final analysis, would be unaffected by the entry of a declaratory judgment declaring article XIV, § 4 invalid, such a judgment would be merely advisory in character and therefore beyond our power to enter.[45] Accordingly, we deny (1) the motion for summary declaratory judgment on Count I of the *Dyer* Complaint; (2) the Motion for Partial Summary Declaratory Judgment on Count I of the *Netsch* Complaint; and (3) the Motion for Expedited Consideration of the Motion for Partial Summary Judgment in the *Netsch* case. Finally, having determined that plaintiffs are not entitled to injunctive relief, we order that summary judgment be entered for defendants in both cases.[46]

---

44. 28 U.S.C. § 2281 provides:
"An interlocutory or permanent injunction restraining the enforcement, operation or execution of any State statute by restraining the action of any officer of such State in the enforcement or execution of such statute or of an order made by an administrative board or commission acting under State statutes, shall not be granted by any district court or judge thereof upon the ground of the unconstitutionality of such statute unless the application therefor is heard and determined by a district court of three judges under section 2284 of this title."
State constitutions have been held to be "statutes" within the three-judge requirement of § 2281. American Federation of Labor v. Watson, 327 U.S. 582, 592–593, 66 S.Ct. 761, 90 L.Ed. 873.

45. Hayburn's Case, 2 U.S. (2 Dall.) 409, 1 L.Ed. 436.

46. It is well settled that a district court may enter summary judgment for the nonmoving party even in the absence of a crossmotion if it finds that there are no material issues of fact and that the nonmoving party is entitled to judgment as a matter of law. 6 J. Moore, Federal Practice ¶ 56.12, at 2242–2243 (1974); 10 C. Wright & A. Miller, Federal Practice and Procedure: Civil § 2720, at 467–470 (1973).