DECEMBER 13, 1979

No. 79–856. GOLDWATER ET AL. v. CARTER, PRESIDENT OF THE UNITED STATES, ET AL. C. A. D. C. Cir. Certiorari granted, judgment vacated, and case remanded with directions to dismiss the complaint. MR. JUSTICE MARSHALL concurs in the result. MR. JUSTICE POWELL concurs in the judgment

and filed a statement. Mr. Justice Rehnquist concurs in the judgment and filed a statement in which The Chief Justice, Mr. Justice Stewart, and Mr. Justice Stevens join. Mr. Justice White and Mr. Justice Blackmun join in the grant of the petition for writ of certiorari but would set the case for argument and give it plenary consideration. Mr. Justice Blackmun filed a statement in which Mr. Justice White joins. Mr. Justice Brennan would grant the petition for writ of certiorari and affirm the judgment of the Court of Appeals and filed a statement.

Mr. Justice Powell, concurring in the judgment.

Although I agree with the result reached by the Court, I would dismiss the complaint as not ripe for judicial review.

## I

This Court has recognized that an issue should not be decided if it is not ripe for judicial review. *Buckley* v. *Valeo,* 424 U. S. 1, 113–114 (1976) (*per curiam*). Prudential considerations persuade me that a dispute between Congress and the President is not ready for judicial review unless and until each branch has taken action asserting its constitutional authority. Differences between the President and the Congress are commonplace under our system. The differences should, and almost invariably do, turn on political rather than legal considerations. The Judicial Branch should not decide issues affecting the allocation of power between the President and Congress until the political branches reach a constitutional impasse. Otherwise, we would encourage small groups or even individual Members of Congress to seek judicial resolution of issues before the normal political process has the opportunity to resolve the conflict.

In this case, a few Members of Congress claim that the President's action in terminating the treaty with Taiwan has deprived them of their constitutional role with respect to

a change in the supreme law of the land. Congress has taken no official action. In the present posture of this case, we do not know whether there ever will be an actual confrontation between the Legislative and Executive Branches. Although the Senate has considered a resolution declaring that Senate approval is necessary for the termination of any mutual defense treaty, see 125 Cong. Rec. 13672, 13695–13697 (1979), no final vote has been taken on the resolution. See *id.*, at 32522–32531. Moreover, it is unclear whether the resolution would have retroactive effect. See *id.*, at 13711–13721; *id.*, at 15210. It cannot be said that either the Senate or the House has rejected the President's claim. If the Congress chooses not to confront the President, it is not our task to do so. I therefore concur in the dismissal of this case.

## II

MR. JUSTICE REHNQUIST suggests, however, that the issue presented by this case is a nonjusticiable political question which can never be considered by this Court. I cannot agree. In my view, reliance upon the political-question doctrine is inconsistent with our precedents. As set forth in the seminal case of *Baker* v. *Carr*, 369 U. S. 186, 217 (1962), the doctrine incorporates three inquiries: (i) Does the issue involve resolution of questions committed by the text of the Constitution to a coordinate branch of Government? (ii) Would resolution of the question demand that a court move beyond areas of judicial expertise? (iii) Do prudential considerations counsel against judicial intervention? In my opinion the answer to each of these inquiries would require us to decide this case if it were ready for review.

First, the existence of "a textually demonstrable constitutional commitment of the issue to a coordinate political department," *ibid.*, turns on an examination of the constitutional provisions governing the exercise of the power in question.

*Powell* v. *McCormack,* 395 U. S. 486, 519 (1969). No constitutional provision explicitly confers upon the President the power to terminate treaties. Further, Art. II, § 2, of the Constitution authorizes the President to make treaties with the advice and consent of the Senate. Article VI provides that treaties shall be a part of the supreme law of the land. These provisions add support to the view that the text of the Constitution does not unquestionably commit the power to terminate treaties to the President alone. Cf. *Gilligan* v. *Morgan,* 413 U. S. 1, 6 (1973); *Luther* v. *Borden,* 7 How. 1, 42 (1849).

Second, there is no "lack of judicially discoverable and manageable standards for resolving" this case; nor is a decision impossible "without an initial policy determination of a kind clearly for nonjudicial discretion." *Baker* v. *Carr, supra,* at 217. We are asked to decide whether the President may terminate a treaty under the Constitution without congressional approval. Resolution of the question may not be easy, but it only requires us to apply normal principles of interpretation to the constitutional provisions at issue. See *Powell* v. *McCormack, supra,* at 548–549. The present case involves neither review of the President's activities as Commander in Chief nor impermissible interference in the field of foreign affairs. Such a case would arise if we were asked to decide, for example, whether a treaty required the President to order troops into a foreign country. But "it is error to suppose that every case or controversy which touches foreign relations lies beyond judicial cognizance." *Baker* v. *Carr, supra,* at 211. This case "touches" foreign relations, but the question presented to us concerns only the constitutional division of power between Congress and the President.

A simple hypothetical demonstrates the confusion that I find inherent in MR. JUSTICE REHNQUIST's opinion concurring in the judgment. Assume that the President signed a mutual defense treaty with a foreign country and announced that it

would go into effect despite its rejection by the Senate. Under MR. JUSTICE REHNQUIST's analysis that situation would present a political question even though Art. II, § 2, clearly would resolve the dispute. Although the answer to the hypothetical case seems self-evident because it demands textual rather than interstitial analysis, the nature of the legal issue presented is no different from the issue presented in the case before us. In both cases, the Court would interpret the Constitution to decide whether congressional approval is necessary to give a Presidential decision on the validity of a treaty the force of law. Such an inquiry demands no special competence or information beyond the reach of the Judiciary. Cf. *Chicago & Southern Air Lines* v. *Waterman S.S. Corp.*, 333 U. S. 103, 111 (1948).[1]

Finally, the political-question doctrine rests in part on prudential concerns calling for mutual respect among the three branches of Government. Thus, the Judicial Branch should avoid "the potentiality of embarrassment [that would result] from multifarious pronouncements by various departments on one question." Similarly, the doctrine restrains judicial action where there is an "unusual need for unquestioning adherence to a political decision already made." *Baker* v. *Carr, supra,* at 217.

If this case were ripe for judicial review, see Part I, *supra,* none of these prudential considerations would be present.

---

[1] The Court has recognized that, in the area of foreign policy, Congress may leave the President with wide discretion that otherwise might run afoul of the nondelegation doctrine. *United States* v. *Curtiss-Wright Export Corp.*, 299 U. S. 304 (1936). As stated in that case, "the President alone has the power to speak or listen as a representative of the Nation. He *makes* treaties with the advice and consent of the Senate; but he alone negotiates." *Id.,* at 319 (emphasis in original). Resolution of this case would interfere with neither the President's ability to negotiate treaties nor his duty to execute their provisions. We are merely being asked to decide whether a treaty, which cannot be ratified without Senate approval, continues in effect until the Senate or perhaps the Congress takes further action.

Interpretation of the Constitution does not imply lack of respect for a coordinate branch. *Powell* v. *McCormack, supra,* at 548. If the President and the Congress had reached irreconcilable positions, final disposition of. the question presented by this case would eliminate, rather than create, multiple constitutional interpretations. The specter of the Federal Government brought to a halt because of the mutual intransigence of the President and the Congress would require this Court to provide a resolution pursuant to our duty " 'to say what the law is.' " *United States* v. *Nixon,* 418 U. S. 683, 703 (1974), quoting *Marbury* v. *Madison,* 1 Cranch 137, 177 (1803).

## III

In my view, the suggestion that this case presents a political question is incompatible with this Court's willingness on previous occasions to decide whether one branch of our Government has impinged upon the power of another. See *Buckley* v. *Valeo,* 424 U. S., at 138; *United States* v. *Nixon, supra,* at 707; *The Pocket Veto Case,* 279 U. S. 655, 676–678 (1929); *Myers* v. *United States,* 272 U. S. 52 (1926).[2] Under the

---

[2] *Coleman* v. *Miller,* 307 U. S. 433 (1939), is not relevant here. In that case, the Court was asked to review the legitimacy of a State's ratification of a constitutional amendment. Four Members of the Court stated that Congress has exclusive power over the ratification process. *Id.,* at 456–460 (Black, J., concurring, joined by Roberts, Frankfurter, and Douglas, JJ.). Three Members of the Court concluded more narrowly that the Court could not pass upon the efficacy of state ratification. They also found no standards by which the Court could fix a reasonable time for the ratification of a proposed amendment. *Id.,* at 452–454.

The proposed constitutional amendment at issue in *Coleman* would have overruled decisions of this Court. Compare *id.,* at 435, n. 1, with *Child Labor Tax Case,* 259 U. S. 20 (1922); *Hammer* v. *Dagenhart,* 247 U. S. 251 (1918). Thus, judicial review of the legitimacy of a State's ratification would have compelled this Court to oversee the very constitutional process used to reverse Supreme Court decisions. In such circumstances it may be entirely appropriate for the Judicial Branch of Government to step aside. See Scharpf, Judicial Review and The Political

criteria enunciated in *Baker* v. *Carr,* we have the responsibility to decide whether both the Executive and Legislative Branches have constitutional roles to play in termination of a treaty. If the Congress, by appropriate formal action, had challenged the President's authority to terminate the treaty with Taiwan, the resulting uncertainty could have serious consequences for our country. In that situation, it would be the duty of this Court to resolve the issue.

Mr. Justice Rehnquist, with whom The Chief Justice, Mr. Justice Stewart, and Mr. Justice Stevens join, concurring in the judgment.

I am of the view that the basic question presented by the petitioners in this case is "political" and therefore nonjusticiable because it involves the authority of the President in the conduct of our country's foreign relations and the extent to which the Senate or the Congress is authorized to negate the action of the President. In *Coleman* v. *Miller,* 307 U. S. 433 (1939), a case in which members of the Kansas Legislature brought an action attacking a vote of the State Senate in favor of the ratification of the Child Labor Amendment, Mr. Chief Justice Hughes wrote in what is referred to as the "Opinion of the Court":

> "We think that . . . the question of the efficacy of ratifications by state legislatures, in the light of previous rejection or attempted withdrawal, should be regarded as a political question pertaining to the political departments, with the ultimate authority in the Congress in the exercise of its control over the promulgation of the adoption of the Amendment.
>
> "The precise question as now raised is whether, when the legislature of the State, as we have found, has actually ratified the proposed amendment, the Court should

Question: A Functional Analysis, 75 Yale L. J. 517, 589 (1966). The present case involves no similar principle of judicial nonintervention.

> restrain the state officers from certifying the ratification to the Secretary of State, because of an earlier rejection, and thus prevent the question from coming before the political departments. We find no basis in either Constitution or statute for such judicial action. Article V, speaking solely of ratification, contains no provision as to rejection. . . ." *Id.,* at 450.

Thus, Mr. Chief Justice Hughes' opinion concluded that "Congress in controlling the promulgation of the adoption of a constitutional amendment has the final determination of the question whether by lapse of time its proposal of the amendment had lost its vitality prior to the required ratifications." *Id.,* at 456.

I believe it follows *a fortiori* from *Coleman* that the controversy in the instant case is a nonjusticiable political dispute that should be left for resolution by the Executive and Legislative Branches of the Government. Here, while the Constitution is express as to the manner in which the Senate shall participate in the ratification of a treaty, it is silent as to that body's participation in the abrogation of a treaty. In this respect the case is directly analogous to *Coleman, supra.* As stated in *Dyer* v. *Blair,* 390 F. Supp. 1291, 1302 (ND Ill. 1975) (three-judge court):

> "A question that might be answered in different ways for different amendments must surely be controlled by political standards rather than standards easily characterized as judicially manageable."

In light of the absence of any constitutional provision governing the termination of a treaty, and the fact that different termination procedures may be appropriate for different treaties (see, *e. g.,* n. 1, *infra*), the instant case in my view also "must surely be controlled by political standards."

I think that the justifications for concluding that the question here is political in nature are even more compelling than in *Coleman* because it involves foreign relations—specifically

a treaty commitment to use military force in the defense of a'
foreign government if attacked. In *United States* v. *Curtiss-
Wright Corp.,* 299 U. S. 304 (1936), this Court said:

> "Whether, if the Joint Resolution had related solely to
> internal affairs it would be open to the challenge that it
> constituted an unlawful delegation of legislative power to
> the Executive, we find it unnecessary to determine. The
> whole aim of the resolution is to affect a situation en-
> tirely external to the United States, and falling within
> the category of foreign affairs. . . ." *Id.,* at 315.

The present case differs in several important respects from
*Youngstown Sheet & Tube Co.* v. *Sawyer,* 343 U. S. 579
(1952), cited by petitioners as authority both for reaching the
merits of this dispute and for reversing the Court of Appeals.
In *Youngstown,* private litigants brought a suit contesting the
President's authority under his war powers to seize the Na-
tion's steel industry, an action of profound and demonstrable
domestic impact. Here, by contrast, we are asked to settle
a dispute between coequal branches of our Government, each
of which has resources available to protect and assert its in-
terests, resources not available to private litigants outside
the judicial forum.[1] Moreover, as in *Curtiss-Wright,* the

---

[1] As observed by Chief Judge Wright in his concurring opinion below:

"Congress has initiated the termination of treaties by directing or requir-
ing the President to give notice of termination, without any prior presi-
dential request. Congress has annulled treaties without any presidential
notice. It has conferred on the President the power to terminate a par-
ticular treaty, and it has enacted statutes practically nullifying the do-
mestic effects of a treaty and thus caused the President to carry out
termination. . . .

"Moreover, Congress has a variety of powerful tools for influencing for-
eign policy decisions that bear on treaty matters. Under Article I, Sec-
tion 8 of the Constitution, it can regulate commerce with foreign nations,
raise and support armies, and declare war. It has power over the appoint-
ment of ambassadors and the funding of embassies and consulates.

effect of this action, as far as we can tell, is "entirely external to the United States, and [falls] within the category of foreign affairs." Finally, as already noted, the situation presented here is closely akin to that presented in *Coleman,* where the Constitution spoke only to the procedure for ratification of an amendment, not to its rejection.

Having decided that the question presented in this action is nonjusticiable, I believe that the appropriate disposition is for this Court to vacate the decision of the Court of Appeals and remand with instructions for the District Court to dismiss the complaint. This procedure derives support from our practice in disposing of moot actions in federal courts.[2] For more than 30 years, we have instructed lower courts to vacate any decision on the merits of an action that has become moot prior to a resolution of the case in this Court. *United States* v. *Munsingwear, Inc.,* 340 U. S. 36 (1950). The Court has required such decisions to be vacated in order to "prevent a judgment, unreviewable because of mootness, from spawning any legal consequences." *Id.,* at 41. It is even more imperative that this Court invoke this procedure to ensure that resolution of a "political question," which should not have been decided by a lower court, does not "spawn any legal consequences." An Art. III court's resolution of a question that is "political" in character can create far more dis-

---

Congress thus retains a strong influence over the President's conduct in treaty matters.

"As our political history demonstrates, treaty creation and termination are complex phenomena rooted in the dynamic relationship between the two political branches of our government. We thus should decline the invitation to set in concrete a particular constitutionally acceptable arrangement by which the President and Congress are to share treaty termination." App. to Pet. for Cert. 44A–45A (footnotes omitted).

[2] This Court, of course, may not prohibit state courts from deciding political questions, any more than it may prohibit them from deciding questions that are moot, *Doremus* v. *Board of Education,* 342 U. S. 429, 434 (1952), so long as they do not trench upon exclusively federal questions of foreign policy. *Zschernig* v. *Miller,* 389 U. S. 429, 441 (1968).

ruption among the three coequal branches of Government than the resolution of a question presented in a moot controversy. Since the political nature of the questions presented should have precluded the lower courts from considering or deciding the merits of the controversy, the prior proceedings in the federal courts must be vacated, and the complaint dismissed.

MR. JUSTICE BLACKMUN, with whom MR. JUSTICE WHITE joins, dissenting in part.

In my view, the time factor and its importance are illusory; if the President does not have the power to terminate the treaty (a substantial issue that we should address only after briefing and oral argument), the notice of intention to terminate surely has no legal effect. It is also indefensible, without further study, to pass on the issue of justiciability or on the issues of standing or ripeness. While I therefore join in the grant of the petition for certiorari, I would set the case for oral argument and give it the plenary consideration it so obviously deserves.

MR. JUSTICE BRENNAN, dissenting.

I respectfully dissent from the order directing the District Court to dismiss this case, and would affirm the judgment of the Court of Appeals insofar as it rests upon the President's well-established authority to recognize, and withdraw recognition from, foreign governments. App. to Pet. for Cert. 27A–29A.

In stating that this case presents a nonjusticiable "political question," MR. JUSTICE REHNQUIST, in my view, profoundly misapprehends the political-question principle as it applies to matters of foreign relations. Properly understood, the political-question doctrine restrains courts from reviewing an exercise of foreign policy judgment by the coordinate political branch to which authority to make that judgment has been "constitutional[ly] commit[ted]." *Baker* v. *Carr,* 369 U. S.

186, 211–213, 217 (1962). But the doctrine does not pertain when a court is faced with the *antecedent* question whether a particular branch has been constitutionally designated as the repository of political decisionmaking power. Cf. *Powell* v. *McCormack,* 395 U. S. 486, 519–521 (1969). The issue of decisionmaking authority must be resolved as a matter of constitutional law, not political discretion; accordingly, it falls within the competence of the courts.

The constitutional question raised here is prudently answered in narrow terms. Abrogation of the defense treaty with Taiwan was a necessary incident to Executive recognition of the Peking Government, because the defense treaty was predicated upon the now-abandoned view that the Taiwan Government was the only legitimate political authority in China. Our cases firmly establish that the Constitution commits to the President alone the power to recognize, and withdraw recognition from, foreign regimes. See *Banco Nacional de Cuba* v. *Sabbatino,* 376 U. S. 398, 410 (1964); *Baker* v. *Carr, supra,* at 212; *United States* v. *Pink,* 315 U. S. 203, 228–230 (1942). That mandate being clear, our judicial inquiry into the treaty rupture can go no further. See *Baker* v. *Carr, supra,* at 212; *United States* v. *Pink, supra,* at 229.