Myroslaw Wasylowycz MEDVID by His Next Friends, Paraska Medvid JEZIERSKY (Aunt), Maria Filipovic (Cousin), and Anne Kent (Cousin)

v.

NEW ORLEANS POLICE DEPARTMENT; Warren G. Woodfork, Jr., Chief, New Orleans Police Department; New Orleans Harbor Police; United States Border Patrol; Jesse Tabor, Commander, U.S. Border Patrol; U.S. Immigration and Naturalization Service; David H. Lambert, Director District 28, U.S. Immigration and Naturalization Service; Universal Shipping Agencies, Inc.; Tim Maloz; Michael Slad; Port Ship Service, Inc.; Raymond Gutherie; Seaman A; Seaman B; Seaman C; Seaman D; Seaman E; Seaman F; Seaman G; "Boris Doe", Master, SS Marshal Konev; U.S. Customs Service; J. Robert Grimes, Regional Commissioner, Region 5, U.S. Customs Service; Rear Adm. Clyde T. Lusk, Jr., District Commander, 8th District, U.S. Coast Guard; Captain Lindak, Captain of the Port of New Orleans, U.S. Coast Guard, Bd. of Commissioners of the Port of New Orleans.

Civ. A. No. 85–5065.

United States District Court,
E.D. Louisiana.

Nov. 6, 1985.

---

**504**

Julian E. Kulas, Chicago, Ill., Henry Mark Holzer, Brooklyn, N.Y., Michael S. Wolf, Baton Rouge, La., for plaintiffs.

William . Baity, U.S. Atty., Daniel Lindhardt, U.S. Atty., New Orleans, La., for defendants.

## ORDER AND REASONS

FELDMAN, District Judge.

Before the Court is an application for a temporary restraining order on behalf of the now-celebrated drama involving the Ukrainian seaman, Myroslaw Medvid, by his next friends. It was heard on November 6, 1985. The temporary restraining order asks this Court to order the defendants, various local and national governmental agencies among others, to prevent the removal of seaman Medvid from the jurisdiction of this Court and to deliver him to the custody of his attorneys (who are represented to be those same attorneys appearing on behalf of the next friends). The plaintiff is principally claiming violations of the Refugee Act of 1980, Pub.L. 96–212, 94 Stat. 102 (1980) and the procedures thereunder. See 8 U.S.C. 1158; 8 C.F.R. 208.

The Court assumes the plaintiffs have standing under Rule 17(c) of the Federal Rules of Civil Procedure.

The events surrounding this now well-known international incident began the evening of October 24, 1985 near Belle Chasse, Louisiana in the Mississippi River. Seaman Medvid was assigned to a Russian merchant vessel, the SS Marshal Konev. At approximately 8:00 p.m. that evening he apparently left his ship, swam a quarter mile from ship to shore, and encountered Wayne Wyman and his uncle, Joseph Wyman, both residents of Belle Chasse, Louisiana. He indicated to them, in his own language, that he was Ukrainian and wanted to go to the New Orleans Police. According to the Wymans, he was soaking wet and appeared to be extremely nervous. He was carrying some personal possessions in a brown jar. The Wymans thought the man wished to defect, although they weren't sure of his intentions, and Wayne Wyman took him to a New Orleans police station in the French Quarter. Apparently, at approximately 10:30 p.m. Medvid was interviewed by the New Orleans Harbor Police, who contacted the Immigration and Naturalization Service. The INS secured the services of an interpreter in New York, Irene Padoch, who spoke to Medvid in his native Ukrainian tongue for approximately thirty minutes while an INS officer listened and indicated to Mrs. Padoch the questions which she should ask Medvid. According to Mrs. Padoch, Medvid indicated on two occasions during that conversation that he wished to remain in the United States. For reasons which are unclear, an agency of the Federal Government, either the INS or the Border Patrol, summarily issued an order directing that Medvid be returned to his vessel and the Border Patrol contacted the vessel's American agent, Universal Shipping Agencies, and told the agent to return the seaman to his ship. At approximately 2:30 a.m. on October 25, 1985 Medvid was returned to his ship. Upon his return, Medvid again jumped into the water and tried to leave the ship and reach the

shore. He was forcibly returned to the ship by members of the ship's crew and the ship's American agent.

At this point in the story it seems undisputed that Medvid had indicated to Mrs. Padoch that he wished to remain in the United States and, therefore, the reasons for the order that he be returned to the vessel are unclear. What is clear, however, is that immediately after his second attempt to leave the ship, the State Department got involved. According to the testimony of William M. Woessner, Acting Assistant Secretary of State for European and Canadian Affairs before the Senate Judiciary Committee on November 5, 1985, the State Department entered the picture at approximately 3:40 p.m. on October 25, 1985. According to the testimony of Secretary Woessner, a copy of which is in evidence, the State Department immediately requested the Coast Guard and Treasury Department to prevent the departure of the ship from the area of the Port of New Orleans and immediately dispatched a Russian-speaking Foreign Service Officer and an Assistant Legal Adviser to the scene. State Department representatives arrived at the vessel at approximately 10:30 p.m. the night of October 25th and, according to Secretary Woessner, from then on the United States had a team of at least six officials aboard the Soviet vessel at all times until seaman Medvid was transferred to the U.S. Coast Guard Cutter Salvia, on October 28th. The United States team included representatives from the State Department, INS, the Treasury Department, and a U.S. Navy doctor. The testimony of Commissioner Alan C. Nelson, Commissioner of INS, also appearing before the Senate Judiciary Committee on November 5, 1985, indicates that members of the National Security Council and the Departments of Transportation, Treasury, State, and Justice in Washington were also. in constant contact with the U.S. on-site team and, finally, senior INS managers and the Commissioner himself worked with personnel on the scene in order to determine whether Mr. Medvid desired political asylum. From the evening of October 26th, two days prior

to being taken to the Coast Guard vessel, the State Department had an interpreter on the scene to insure that communications with seaman Medvid were guaranteed. The interpreter was of Ukrainian heritage and was fluent in both Russian and Ukrainian and was able to communicate with seaman Medvid. (Plaintiffs dispute this but their disbelief is at best speculative.) Medvid received a physical examination on October 26th and was found to be in good condition, not sedated or under the influence of drugs. During that first examination he told the State Department representatives that he wished to return to the Soviet Union. Medvid was clearly and unhesitatingly told from the start that he would not be made to return to the Soviet Union, he would not be imprisoned here, and he could remain in the United States. The United States team, in diplomatic discussions with the Soviets, made it clear that Medvid would have to be interviewed in a non-threatening environment under United States control. Those discussions resulted in Medvid being transferred on October 28th to the Coast Guard vessel. He was given an opportunity to rest and relax on the vessel but declined and proceeded to still a second interview. Throughout this, and other interviews, a medical team, an interpreter, Soviet officials and a Soviet doctor and ship personnel were present. Soviets were present to insure that the United States would have similar access to Americans in the Soviet Union, but the meeting was structured so that there was no intimidation of seaman Medvid. When Medvid became ill, perhaps because of the rough waters of Hurricane Juan, perhaps from personal upset, the interview was interrupted and it was resumed after approximately one-half hour when a U.S. doctor indicated that there was no medical impediment to continuing the interview and Medvid wanted to continue. It is clear that throughout all of these interviews and medical examinations on the Coast Guard vessel, Medvid was told and assured that he was not under arrest, that he was free to remain in the United States,

and that he would not have to return to the Soviet Union against his will. This Court does not doubt that the story Medvid told the interviewers on the Coast Guard vessel about falling overboard while making some electrical repairs was probably untrue, and Medvid probably did desire initially to defect as he told Mrs. Padoch; the evidence of the events of October 24th and October 25th would clearly seem to indicate that, especially when one recalls his second attempt to leave the ship after he had been summarily returned. But there is no doubt that the State Department authorities decided after intense safeguards were established, that Medvid had changed his mind, and his interviewers were confronted with that situation. In order to give him additional time to think about his decision, he was removed from the Coast Guard vessel and taken to a military facility on shore to rest and reconsider his wishes. He was removed from the Coast Guard vessel at 11:15 p.m. on October 28th and was transferred to a nearby Naval facility. Again, contrary to plaintiffs' claims, it was medically determined that he was not under the influence of drugs. After being housed overnight and in U.S. custody, and after having had an evening of relaxation, rest, and television, the conversations with the State Department representatives and others of the U.S. team continued the next morning. Medvid continued to assert his desire to return to the Soviet Union. Throughout at least four interviews, two on the Coast Guard vessel and two at the Naval facility, and after extensive periods of rest and informal recreation, Medvid persisted in stating his desire to return to the Soviet Union. Throughout this period of time he was under medical and psychiatric observation and no impediments were observed. One last time, on October 29th at noon, he was interviewed again and questioned extensively concerning his wishes. They were reiterated, and the U.S. representatives then adjourned to seek advice from officials in Washington. At approximately 3:45 p.m. on October 29th the White House, the Department of State, the Department of Justice, and the INS in-

structed the local team to tell seaman Medvid that he would be allowed to return to the Soviet ship as he requested and he was asked to sign a statement in English and Russian confirming his wishes. After insisting on a few changes in Russian, the statement was signed and the Department of State representatives then accompanied him to the vessel.

Although Commissioner Nelson, in his statement, admits that the INS violated its own "immediate action" procedures by initially summarily returning Mr. Medvid back to the ship without any administrative review of that decision and while it seems certain the INS initially bungled, it is clear that thereafter, over a period of days, extraordinary measures were taken to insure that Mr. Medvid was given the opportunity in non-threatening surroundings to indicate his wishes. Those executive agencies charged with the responsibility for making the decisions which were ultimately made, to return Mr. Medvid to the ship, were given no choice by him.

Plaintiffs claim that this Court should grant the extraordinary measure of a temporary restraining order so that they can interview Mr. Medvid in order to prepare their claim for civil damages. The argument is specious and is an attempt to embroil the judiciary in the business of determining the rightness or wrongness of our Nation's foreign policy. Indeed, the Complaint prays for much more. Plaintiffs ask this Court, as next friends on behalf of seaman Medvid, to order that Medvid be brought before this Court at once in order that it may legally be determined whether his rights have been violated; that this Court grant seaman Medvid the opportunity to meet with his relatives and counsel of his choice in an uncoercive environment free from the effects of drugs (although there has been no evidence of drugs in this case); that plaintiff not be permitted to leave the jurisdiction of this Court; and, finally, that the INS be ordered to issue a Departure Control Order barring Medvid's removal from U.S. territory. The relief requested far transcends the concerns of

an ordinary damage suit for the violation of one's constitutional rights.

In considering whether a temporary restraining order should be granted, this Court must determine several things. Will Medvid suffer irreparable injury unless the injunction issues? Is there a substantial likelihood that he will prevail on the merits? Does the threatened injury to Medvid outweigh whatever harm the restraining order would cause opposing parties? If the restraining order is issued, is it in the public interest? *Barrett v. Roberts,* 551 F.2d 662 (5 Cir.1977); *Conoco, Inc. v. Watt,* 559 F.Supp. 627 (E.D.La.1982).

This Court finds that there is no substantial likelihood that Mr. Medvid will prevail on the merits and, further, that the issuance of a temporary restraining order under these circumstances would not be in the public interest.

The first question which this Court must address is whether there is a substantial likelihood that Mr. Medvid will prevail on the merits?

The lynchpin of plaintiffs' claim here is the treatment Medvid received when he was summarily returned to the ship and the treatment he subsequently received in the ensuing days after the U.S. team interviewed him. In fact, plaintiffs suggest that the person interviewed by the U.S. team might not have even been seaman Medvid. On the other hand, there is no evidence that the person whom the Wymans met was seaman Medvid either. This Court should not be made to speculate beyond what is in the record and there is no evidence in the record to suggest that the Soviet authorities presented an imposter to the United States authorities. Indeed, against the present international setting it defies reason to suggest that the Soviets would gamble with or accept the hazards and risks of such conduct.

Plaintiffs claim that Medvid's constitutional rights were violated. They argue that his right to political asylum and his right to notice of political asylum were infringed. On the contrary, the record indicates that Mr. Medvid was well aware of his rights to asylum and, at one point, indicated that he wished to exercise those rights. Beyond that, the Fifth Circuit has held that notice of the right to file for political asylum is not guaranteed as a constitutional right. *Ramirez-Osorio v. I.N.S.,* 745 F.2d 937, 943 (5 Cir.1984). See also *Jean v. Nelson,* 727 F.2d 957 (11 Cir. 1984) *aff'd,* —— U.S. ——, 105 S.Ct. 2992, 86 L.Ed.2d 664 (1985). It is true that Mr. Medvid has asserted a claim under 42 U.S.C. § 1983, presumably by virtue of the infringement of his rights during the period October 24–25, 1985. The cases teach that aliens have Section 1983 rights. See *Kulkarni v. Nyquist,* 446 F.Supp. 1269 (D.C.N.Y.1977); *Simon v. Lovgren,* 368 F.Supp. 265 (D.C.Virgin Islands 1973); see also *Jackson v. Sargent,* 394 F.Supp. 162 (D.C.Mass.1975), *aff'd* 526 F.2d 64 (1 Cir. 1975). But nothing on this record suggests plaintiff's entitlement to the extraordinary relief requested in order to preserve the integrity of his claim under Section 1983 for damages. Indeed, if Mr. Medvid indicated his desire to return to the Soviet Union, it cannot be said that he might not have waived whatever earlier rights he had by virtue of his summary return to the ship and, therefore, this Court would only be forced to speculate on the likelihood of success of that claim.

On the question of likelihood of success, however, a more serious question of res judicata is presented to this Court. Under the law of this Circuit the plaintiffs may well be deemed to be the successors in interest to those plaintiffs who filed a prior suit in the United States District Court for the District of Columbia. In fact one counsel here, Mr. Kulas, was a plaintiff there. Further, it is the law of this Circuit that all theories which could have been alleged in the District of Columbia suit should have been alleged and might well be barred under principles of res judicata. See *Nilsen v. City of Moss Point,* 701 F.2d 556 (5 Cir.1983); *Southwest Airlines Co. v. Texas International Airlines,* 546 F.2d 84 (5 Cir. 1977), *cert. den.* 434 U.S. 832, 98 S.Ct. 117, 54 L.Ed.2d 93 (1977); *Kemp v. Birming-*

*ham News Company,* 608 F.2d 1049 (5 Cir.1979). Unless this Court were to second guess the United States Court of Appeals for the District of Columbia Circuit, which this Court is unwilling and without authority to do, this Court fails to see how plaintiffs could withstand the res judicata defense which the Government urges. See *Ukranian-American Bar Association, Inc., et al v. George P. Shultz, et al,* Civil Action No. 85–3487, decided by the United States Court of Appeals for the District of Columbia Circuit November 5, 1985 before a panel of Chief Judge Robinson, Circuit Judge Starr, and Senior Circuit Judge McGowan. Plaintiffs argue that the *Shultz* case is too narrow to confront them with the bar of res judicata. This Court does not agree. The Complaint in that case attacked Medvid's deprivation of constitutional rights, argued that his Sixth Amendment right to counsel was denied (a claim which the Fifth Circuit in the *Ramirez* case has already rejected), and claimed that his asylum rights were violated. True, that suit was not a damage suit. But this Court will not be inhibited by artful pleading which presents to this Court a distinction without substance. The fact is that there is privity between the parties in interest in that case and in this case under our law, and the claims presented here could have been presented there. For whatever reasons, strategy or otherwise, they were not.

The Court of Appeals in *Shultz,* however, clearly addresses the similarities which impress this Court. "The crucial question, then," the Court says at page 6 of its Opinion, "was whether Medvid was being forced to leave the country involuntarily." That issue is central to the case presented here. Going on, the Court observes, "The critical events which followed INS' initial errors satisfy us that the District Court quite correctly concluded that the Government's ultimate decision in this matter ... was not shown by plaintiffs in these injunctive proceedings to be arbitrary and capricious." pages 6–7 of Opinion. Were Medvid's rights ultimately violated? The Court pointedly notes, "The procedures were, in a word, thorough and studied [on October 28–29, 1985]. On the record before us, there was not only no rush to judgment, but to the contrary, there was a continued effort over several days and on U.S. territory to ascertain Medvid's true wishes." This Court will not second-guess the Circuit Court in Washington, D.C.

Would the grant of a temporary restraining order be in the public interest? That is our next burden.

Again, the wisdom of the D.C. Circuit Court of Appeals is important:

"While it is clear as a general proposition that judicial relief may be available for unlawful actions committed by the Executive Branch, even in areas touching on foreign relations, ... this principle does not allow the court blindly to issue injunctive relief without due consideration for the doctrine of separation of powers...." page 6 of slip Opinion

In closing argument, counsel for plaintiffs admitted that the relief requested could provoke a direct confrontation between the governments of the Soviet Union and the United States of America. A confrontation which this Court will not trigger. A confrontation in which it is the business of no court to participate or meddle. That somber judgment lies only with the Commander in Chief, the President of the United States of America. It seems all too obvious to remind the parties that the judiciary has no business in those waters. Plaintiffs in *Shultz* asked the Court there to prevent the ship from leaving the United States. They ask this Court to prevent Medvid from leaving the United States. The functional result of both requests for relief is identical and, as the Circuit Court in Washington, D.C. said, "would directly enmesh the judiciary in the most delicate and sensitive matters at the heart of this Nation's foreign relations." page 9 of Opinion. This Court agrees with Justice Rehnquist, that the conduct of our country's foreign relations is not the business of federal courts. See *Goldwater v. Carter,* 444 U.S. 996, 100 S.Ct. 533, 62 L.Ed.2d 428 (1979). The desire to learn the truth is understandably compelling. But the wisdom of doing

 

so should be decided by the proper branch of government, not the Federal Judiciary. Thus, this Court finds that a grant of the temporary restraining order providing the relief requested in the Complaint would not be in the public interest.

## CONCLUSION

This case contains enormous emotional and humanitarian appeal to the personal beliefs of this Court. It triggers an awakening of gratefulness for our own circumstances, and requires an affirmation of regard for all who shall seek to flee to the shores of Freedom. But it also demands respect to the Rule of Law; it requires us all to recall that the legitimacy of our institutions of Justice is the lynchpin of our freedom. And no amount of self-centered patriotism compels this Court to conclude that the judiciary should insert itself into the foreign policy of this country. That would be the functional result of granting a temporary restraining order; it would, as counsel for plaintiffs admitted, possibly provoke a confrontation between this Nation and the Soviet Union. This Court understands the legitimate concerns of all those who have expressed their solidarity with what they believe to be the circumstances of seaman Medvid. But the magnitude of our emotions must yield today. Four Federal Judges of two Federal Courts in Washington, D.C., and the State Department of the United States, in consultation with the National Security Council, and the Departments of Justice, Treasury, and Transportation, as well as senior officials of the INS, have determined that seaman Medvid wishes to return to the Soviet Union and not seek political asylum here and, further, that those agencies charged with the decision-making responsibility did not act unreasonably under law. This Court will not second guess them. While the circumstances surrounding the Medvid incident are unusual, the likelihood that plaintiffs would succeed in the face of all that has occurred until now is at best remote. Further, the grant of a temporary restraining order would not be in the public inter-

est. Accordingly, for the reasons herein expressed,

IT IS ORDERED:

The application of plaintiffs for a temporary restraining order is hereby DENIED.