**BEACON PRODUCTS CORP., et al., Plaintiffs,**

**v.**

**Ronald Wilson REAGAN, et al., Defendants.**

**Civ. A. No. 85–2335–G.**

United States District Court, D. Massachusetts.

April 28, 1986.

Jonathan Shapiro, Max D. Stern, Stern & Shapiro, Boston, Mass., Jules Lobel, University of Pittsburgh Law School, Pittsburgh, Pa., and Michael Ratner, Center for Constitutional Rights, New York City, for plaintiffs.

Richard E. Welch, Asst. U.S. Atty., Boston, Mass., and David Anderson, U.S. Dept. of Justice, Civil Div., Washington, D.C., for defendants.

## MEMORANDUM OF DECISION

GARRITY, District Judge.

Plaintiffs in this action claim that the President of the United States exceeded his statutory and constitutional authority by imposing an embargo on trade with the Republic of Nicaragua and that the Department of State acted unconstitutionally by notifying Nicaragua of a treaty termination without Congressional approval. They seek (a) a declaration that the President was not authorized by statute or the Constitution to impose an embargo, (b) an injunction prohibiting the enforcement of that embargo, and (c) a declaration that the notice of treaty termination is unconstitutional. Defendants in this action are the President, the Secretary of State, the Secretary of the Treasury, the Assistant Secretary of the Treasury and the Director of the Office of Foreign Assets Control. The matter now comes before the court upon the defendants' motion to dismiss the complaint and the plaintiffs' motion for partial summary judgment.

### I.  Facts

On May 1, 1985, finding that "the policies and actions of the Government of Nicaragua constitute an unusual and extraordinary threat to the national security and foreign policy of the United States," President Reagan declared a national emergency and issued Executive Order 12513, which prohibits, *inter alia,* imports into the United States from Nicaragua and exports to Nicaragua from this country.  Exec. Order No. 12513, 50 Fed.Reg. 18629 (1985).  Pur-

suant to the Order, the Secretary of the Treasury promulgated regulations implementing these trade restrictions. See 31 C.F.R. § 540. Furthermore, on May 1, 1985, in accordance with the termination provision of the two countries' Treaty of Friendship, Commerce and Navigation ("FCN Treaty"), the Department of State gave one year's notice to Nicaragua that the United States would be terminating that treaty as of May 1, 1986. See Treaty of Friendship, Commerce and Navigation, Jan. 21, 1956, United States-Nicaragua, 9 U.S.T. 449, T.I.A.S. No. 4024. This action was taken without being submitted to the Senate or the full Congress for approval.

Plaintiffs claim that they have been damaged by the frustration of contracts entered into or about to be entered into with state-owned businesses in Nicaragua before the Presidential trade embargo. They also claim that they have been injured insofar as the treaty termination will increase the risk associated with their ventures in Nicaragua and threatens to deprive them of assurances afforded by the FCN Treaty.

Plaintiff Joseph Sholkin is the sole owner of plaintiffs Beacon Products Corp. ("Beacon") and Boval Products Corp. ("Boval"), two Massachusetts companies that manufacture and sell a variety of plastic household products. In February 1985, Sholkin entered into an agreement on behalf of Beacon with Empresa Nicaragua del Plastico, S.A. ("Nicaraguan Plastics") whereby Beacon was to send various plastic molds and components to Nicaraguan Plastics in return for half of the profits from the sale of products manufactured from the molds. In addition, Beacon agreed to ship cartons for packaging the finished products and to sell plastic resins used in making the products. In March 1985, Beacon sent ten molds with their component parts to Nicaragua. This equipment was insured for $48,500, but plaintiffs claim the replacement value is almost ten times that amount. Beacon was to have sent other molds to Nicaragua through 1986, but the embargo prevented such further shipment. Sholkin also made an offer on behalf of Boval to sell two molding machines and two molds to Nicaraguan Plastics, but, according to plaintiffs, the embargo prevented the completion of any agreement.

Plaintiffs Paul and Joan Katzeff own plaintiff Thanksgiving Coffee Co. ("Thanksgiving"), a California company which roasts and sells coffee in the United States. In April 1985, Paul Katzeff and a representative from Royal Coffee, Thanksgiving's broker, agreed to buy 37,500 pounds of coffee beans per month for three months from Encafe, the Nicaraguan coffee exporter. Encafe agreed to employ Thanksgiving and Royal Coffee as the exclusive agent for unprocessed coffee exports to the United States. The first purchase was scheduled for June 1985, but the embargo prevented Thanksgiving from importing any coffee.[1]

## II. The Embargo

### A. Statutory Scheme

A brief description of the statutory scheme at issue will be helpful in addressing plaintiffs' challenge to the embargo. In imposing the embargo, the President relied on "the authority vested in [him] as President by the Constitution and laws of the United States of America including the International Emergency Economic Powers Act [and] the National Emergencies Act." Exec. Order No. 12513.

The National Emergencies Act ("NEA"), 50 U.S.C. § 1601 et seq., is comprised of four subchapters. The second of these subchapters, Title II, 50 U.S.C. §§ 1621, 1622, authorizes the President to declare a national emergency, 50 U.S.C. § 1621, and

---

**1.** Another plaintiff, Arthur Barisano, is a Massachusetts resident who asserts that the embargo has prevented him from donating two typewriters and other office supplies to Nicaragua's National Assembly. He asserts that the regulations implementing the embargo are unconstitutionally vague and deprive him of his First Amendment right of free speech. However, at a hearing before this court on January 13, 1986, plaintiffs' counsel indicated that they did not oppose defendants' motion to dismiss with regard to Barisano's claims. Accordingly, the defendants' motion to dismiss Barisano's claims is ordered granted.

provides for termination of an emergency state by concurrent resolution of Congress or presidential proclamation. 50 U.S.C. § 1622(a). Title II also provides for automatic termination if the President fails to transmit notice to Congress of a continuation of the emergency within ninety days of the anniversary of the emergency declaration. 50 U.S.C. § 1622(d). In the instant case, notice was transmitted to Congress of the continuation of the emergency by President Reagan on April 22, 1986. 132 Cong. Rec. S4660, H2097 (daily ed. Apr. 22, 1986).

The International Emergency Economic Powers Act ("IEEPA"), 50 U.S.C. § 1701 *et seq.*, grants the President certain powers to deal with "any unusual and extraordinary threat which has its source in whole or substantial part outside the United States to the national security, foreign policy, or economy of the United States." 50 U.S.C. § 1701(a). Among these powers is the power to prevent the "importation or exportation of . . . any property in which any foreign country or a national thereof has any interest; by any person, or with respect to any property, subject to the jurisdiction of the United States." 50 U.S.C. § 1702(a)(1). The President's IEEPA powers may be exercised only when a state of national emergency has been declared. 50 U.S.C. § 1701(b).

## B. Justiciability

Plaintiffs claim, relying upon *INS v. Chadha*, 1983, 462 U.S. 919, 103 S.Ct. 2764, 77 L.Ed.2d 317, that when the President imposed the embargo on May 1, 1985, Title II of the NEA was unconstitutional because it provided for termination of a national emergency by concurrent resolution of Congress.[2] Plaintiffs maintain that the President therefore did not have the authority to declare a national emergency and could not trigger his IEEPA powers. They also contend that even if he did have the authority to declare a national emergency, the President was not empowered to impose an embargo by IEEPA because Nicaragua did not pose "an unusual and extraordinary threat" as required by § 1701(b).

Defendants maintain that these challenges to the embargo raise nonjusticiable political questions. The political question doctrine operates as a prudential limitation on the courts' review of other branches of government; it is "primarily a function of the separation of powers." *Baker v. Carr*, 1961, 369 U.S. 186, 210, 82 S.Ct. 691, 706, 7 L.Ed.2d 663. As the Supreme Court noted,

> Prominent on the surface of any case held to involve a political question is found a textually demonstrable constitutional commitment of the issue to a coordinate political department; or a lack of judicially discoverable and manageable standards for resolving it; or the impossibility of deciding without an initial policy determination of a kind clearly for nonjudicial discretion; or the impossibility of a court's undertaking independent resolution without expressing lack of respect due coordinate branches of government; or an unusual need for unquestioning adherence to a political decision already made; or the potentiality of embarrassment from multifarious pronouncements by various departments on one question.

Id. at 217, 82 S.Ct. at 710. These concerns are particularly acute whenever a court is called upon to review the conduct of American foreign policy. Nevertheless, "it is error to suppose that every case or controversy which touches foreign relations lies beyond judicial cognizance." Id. at 211, 82 S.Ct. at 707.

■ Indeed, a comparison of plaintiffs' two challenges to the embargo demonstrates the need for a case-by-case inquiry with regard to the justiciability of the questions presented. On the one hand, to address the claim that Nicaragua does not pose an unusual and extraordinary threat

---

**2.** Thereafter, on August 16, 1985, Congress amended Title II to provide for termination by joint rather than concurrent resolution. Pub.L. No. 99–93, § 801, 99 Stat. 448 (1985). We agree with plaintiffs, however, that the fact that the NEA may now be constitutional does not moot their challenge to actions taken pursuant to the NEA as constituted on May 1, 1985.

to the United States would be an imprudent exercise of judicial review. In effect, such review would require the court to assess the wisdom of the President's judgment concerning the nature and extent of that threat, a matter not susceptible to judicially manageable standards. How, for example, is the court to determine whether Nicaragua poses more than an ordinary or usual threat? How is a court to resolve disputed issues of fact concerning the situation in Nicaragua? The court simply lacks the resources and expertise to address these questions. Compare *Crockett v. Reagan,* D.D.C.1982, 558 F.Supp. 893, aff'd D.C.Cir. 1983, 720 F.2d 1355. Nor could it resolve such questions without making its own policy judgments about national security and foreign policy, judgments best left to the political branches of the federal government. See *Harisiades v. Shaughnessy,* 1952, 342 U.S. 580, 589, 72 S.Ct. 512, 519, 96 L.Ed. 586. Consequently, we find that whether Nicaragua poses a sufficient threat to trigger the President's IEEPA powers is a nonjusticiable political question.

■ On the other hand, plaintiffs' claim that the President exercised his power pursuant to an unconstitutional statute is a matter appropriate for judicial resolution. This claim does not require that the court second guess the President's foreign policy judgment. Instead, it goes to the scope of the President's authority under the Constitution: we must determine whether congressional authorization of the President to impose the embargo was accomplished through constitutionally permissible means and, if not, whether the President has the inherent authority to impose an embargo, both questions which

courts are competent to answer. See, e.g., *INS v. Chadha, supra,* 462 U.S. at 940, 103 S.Ct. at 2278–79 ("whether Congress has chosen a constitutionally permissible means of implementing [its plenary power over aliens]" is justiciable), *Youngstown Sheet & Tube Co. v. Sawyer,* 1952, 343 U.S. 579, 72 S.Ct. 863, 96 L.Ed. 1153 (seizure of steel mills was not within President's inherent constitutional power). Resolution of these issues relies on constitutional and statutory interpretation, a function not only susceptible to judicially manageable standards, but one entrusted to the courts by the Constitution. See *United States v. Nixon,* 1974, 418 U.S. 683, 703, 94 S.Ct. 3090, 3105, 41 L.Ed.2d 1039, quoting *Marbury v. Madison,* 1803, 1 Cranch. 137, 177, 2 L.Ed. 60 (" 'it is emphatically the province and duty of the judicial department to say what the law is' "). Moreover, constitutional interpretation "does not imply lack of respect for a coordinate branch" and serves to "eliminate, rather than create, multiple constitutional interpretations." *Goldwater v. Carter,* 1979, 444 U.S. 996, 1001, 100 S.Ct. 533, 536, 62 L.Ed.2d 428 (Powell, J. concurring). In fact, the Supreme Court has addressed the constitutional scope of the President's IEEPA powers in two recent cases. See *Regan v. Wald,* 1984, 468 U.S. 222, 104 S.Ct. 3026, 82 L.Ed.2d 171, *Dames & Moore v. Regan,* 1981, 453 U.S. 654, 101 S.Ct. 2972, 69 L.Ed.2d 918. We conclude, therefore, that the question of whether the President had the authority under the Constitution to impose the embargo on May 1, 1985 is justiciable.[3]

### C. Merits

■ Plaintiffs contend that on May 1, 1985, § 1622 of the NEA was unconstitu-

---

**3.** Defendants claim that because plaintiffs have not sought licenses from the Treasury Department which would exempt them from the embargo, they have not exhausted their administrative remedies, and therefore, this question is not ripe for judicial review. We disagree. Although exhaustion generally "serves interests of accuracy, efficiency, agency and judicial economy," it is not an absolute requirement, and "courts are free to use their discretion." *Ezratty v. Commonwealth of Puerto Rico,* 1 Cir.1981, 648 F.2d 770, 774. In the instant case, no interest will be furthered by requiring plaintiffs to

pursue an administrative remedy. Their contemplated trade with Nicaragua falls clearly outside the exemptions provided for by the Treasury Department's regulations. See 31 C.F.R. §§ 540.401, 540.409, 540.504, 540.505. Consequently, pursuit of administrative remedies would be futile. Furthermore, proceedings at the administrative level would neither moot plaintiffs' constitutional challenge nor provide a factual record which would assist this court in ruling on that challenge. See *Atlantic Richfield Co. v. Department of Energy,* D.C.Cir.1984, 769 F.2d 771, 782.

tional because it provided for termination of a national emergency by concurrent resolution of Congress. Plaintiffs further argue that this termination provision was not severable from Title II of the statute and therefore the entire subchapter was invalid, including § 1621 authorizing the President to declare a national emergency. Plaintiffs conclude that if we find that the President was not properly authorized by the NEA to declare a national emergency, then we must also find that his imposition of an embargo was invalid inasmuch as the exercise of IEEPA powers is contingent upon the declaration of a national emergency.

*INS v. Chadha, supra,* held that a one-house legislative veto of the executive branch's exercise of delegated authority was unconstitutional because it did not conform to the procedural requirements attendant to legislative action imposed by Article I, § 7 of the Constitution. Similarly, in this case, the provision for termination by concurrent resolution is unconstitutional because, unlike a joint resolution, termination by concurrent resolution would enable Congress to take legislative action without presenting the action to the President for his signature.[4]

■ The question remains to be determined whether the President's authority to declare a national emergency is thereby negated. Defendants maintain that the offending termination provision is severable from the remainder of the statute, and therefore, the President's authority to declare a national emergency remains intact. Furthermore, they argue that even if the NEA is unconstitutional in its entirety, the President's power to declare a national emergency can be implied from IEEPA or from the Constitution itself.

The court need not address whether the President's power to declare a national emergency can be implied from the Constitution, however, because it finds that the unconstitutional congressional termination provision is severable from the NEA and that the balance of the statute provides a basis for the declaration in question. Severability turns in large part upon legislative intent, "but the presumption is in favor of severability." *Regan v. Time, Inc.,* 468 U.S. 641, 1984, 104 S.Ct. 3262, 3269, 82 L.Ed.2d 487. In fact, "Unless it is evident that the legislature would not have enacted those provisions which are within its power, independently of that which is not, the invalid part may be dropped if what is left is fully operative as a law." *Buckley v. Valeo,* 1976, 424 U.S. 1, 108–09, 96 S.Ct. 612, 677, 46 L.Ed.2d 659 quoting *Champlin Refining Co. v. Corporation Commission,* 1932, 286 U.S. 210, 234, 52 S.Ct. 559, 565–66, 76 L.Ed.2d 1062. In light of this presumption, "the burden is placed squarely on the party arguing against severability to demonstrate that Congress would not have enacted the provision without the severed portion." *Alaska Airlines, Inc. v. Donovan, supra* at 1560.

In this case, plaintiffs seek to establish that Congress would not have enacted the remainder of Title II of the NEA without retaining the power to terminate presidentially declared national emergencies by concurrent resolution. They argue that several factors demonstrate that Congress would not have explicitly authorized the President to declare national emergencies absent a legislative check to that power. Specifically, they maintain that the NEA's requirement that Congress vote each six months on whether to terminate,[5] the importance attached to the legislative veto

---

**4.** Although Congress did not exercise this legislative veto, the matter is still ripe for review. "In the post-*Chadha* era in which Congress knows that it may not lawfully exercise the purported veto authority, to hold that a court cannot reach the issue of the constitutionality of such a device unless Congress has exercised the provision would be, in effect, to shield all [exec-

utive] action from review as to whether Congress would have provided the underlying authority without its veto oversight. *Alaska Airlines, Inc. v. Donovan,* D.C.Cir.1985, 766 F.2d 1550, 1556.

**5.** 50 U.S.C. § 1622(b).

during consideration of the NEA,[6] and the fact that this veto power was a product of compromise between the President and Congress,[7] all establish the central importance of the provision for termination by concurrent resolution. Furthermore, plaintiffs contend that the absence of a severability clause also supports a finding of nonseverability.

However, a review of the legislative history persuades us otherwise. The NEA emerged from congressional recognition that "the whole field of emergency statutes and procedures was in disarray," and "there was little historical guidance for declaring, administering, or terminating states of national emergency." S.Rep. No. 1168, 94th Cong., 2d Sess. 9, *reprinted in* 1976 U.S.Code Cong. & Ad.News 2288, 2295. Although various statutes conferred emergency powers upon the President, his authority to declare national emergencies had to be implied from the statutes because none of these statutes explicitly authorized him to do so. See National Emergencies Act: Hearings on H.R. 3884 before the Subcommittee on Administrative Law and Governmental Relations, 94th Cong., 1st Sess. 91 (1975) (testimony of Assistant Attorney General Scalia). Nor were there explicit termination provisions regarding such emergencies. Consequently, "proposals for the use of emergency power often generate[d] discussion as to whether existing emergencies ha[d] lapsed or grown stale due to passage of time and change of circumstances." H.R.Rep. No. 238, 94th Cong., 1st Sess. 6 (1975). In fact, until the NEA was enacted, presidential emergency declarations issued in 1933, 1950, 1970 and 1971 were still in effect, and the powers conferred by the approximately 470 statutes relating to these emergencies were still available to the President. S.Rep. No. 1168, *supra* at 2, 9.

The NEA was designed to remedy the procedural uncertainty which surrounded the President's exercise of emergency power and to subject such power to congressional oversight. S.Rep. No. 1168, *supra* at 2. Clearly, termination by concurrent resolution was the most potent component of that oversight. Nevertheless, even without a legislative veto provision, Title II of the NEA introduces a greater degree of procedural regularity and congressional oversight than had been the case prior to the NEA's passage. After severance of the unconstitutional provision, Title II still requires that the President notify Congress of the continuing existence of a state of emergency each year and prescribes explicit means for terminating such emergencies, two limitations on a previously undefined power. Moreover, we note that inasmuch as the President's power to declare national emergencies had been implied from other statutes, prior to the NEA's enactment, the invalidity of Title II in its entirety would not serve to deprive the President of that power. Consequently, although Congress may have strongly preferred to have a legislative veto, the record indicates that it would have rather enacted Title II absent such a provision than passed no statute at all. See *Alaska Airlines, Inc. v. Donovan, supra* at 1560, cf. *EEOC v. CBS, Inc.,* 2 Cir.1984, 743 F.2d 969, 970 (without a legislative veto provision, Congress would have been unwilling to delegate extensive authority upon President to reorganize executive departments and agencies). Accordingly, that unconstitutional provision is sev-

---

6. Senator Mathias, one of the sponsors of the NEA, for example, commented, ". . . it would be irresponsible to propose a termination of the four concurrent states of national emergency without providing a means for declaring and terminating future emergencies." 120 Cong. Rec. 29980 (1974).

7. When initially proposed, the NEA contained provisions for termination upon the passage of 180 days unless Congress voted to continue the state of emergency. 120 Cong. Record 29981 (1974). However, the President objected to the automatic termination. Congress agreed to drop this provision, but the concurrent resolution procedure was strengthened to provide for congressional vote on whether to terminate the emergency every six months. See National Emergencies Act: Hearings on H.R. 3884 before the Committee on Government Operations, United States Senate, 94th Cong. 2nd Sess. 17–18 (1976).

erable, and defendants' motion to dismiss plaintiffs' challenge to the embargo is granted.[8]

### III. Treaty Termination

In addition to challenging the constitutionality of the embargo, plaintiffs contest the validity of the May 1, 1985 notice of termination of the FCN Treaty. Specifically, plaintiffs argue that the Constitution does not authorize the President to terminate a treaty without some form of congressional approval and therefore the notice of termination should not be given legal effect[9] unless Congress or two-thirds of the Senate ratifies the President's action. Plaintiffs allege that the prospective termination will adversely affect the economic climate between Nicaragua and the United States inasmuch as the FCN Treaty provides assurances which reduce the degree of risk surrounding transactions between the two countries.[10] According to plaintiffs, the treaty termination will expose their ventures in Nicaragua to greater risk and consequently will diminish the value of their contracts. Plaintiffs also allege that the termination will deprive them of rights afforded to them under the FCN Treaty.

### A. Justiciability

■ Relying on *Goldwater v. Carter*, 1979, 444 U.S. 996, 100 S.Ct. 533, 62 L.Ed.2d 428, defendants move to dismiss plaintiffs' claim regarding the notice of termination of the treaty on the ground that it raises a nonjusticiable political question. In *Goldwater*, members of Congress challenged President Carter's unilateral termination of a treaty with Taiwan. The Supreme Court vacated a decision on the merits by the Court of Appeals, and held that the claim was nonjusticiable, with a plurality holding that the issue raised a political question.[11]

Plaintiffs contend that *Goldwater* is distinguishable because plaintiffs here are private individuals and corporations rather than Congressmen as in the *Goldwater* case. A factor emphasized in the plurality's opinion in *Goldwater* was that the case presented "a dispute between coequal branches of our Government, each of which has resources available to protect and assert its interests, resources not available to private litigants outside the judicial forum," *Goldwater, supra* at 1004, 100 S.Ct. at 538 (Rehnquist, J. concurring) and therefore the plurality found that *Goldwater* was distinguishable from *Youngstown*

**8.** In plaintiffs' reply memorandum, they claim for the first time that the continuation of the embargo is statutorily unauthorized because Congress has not voted on whether to terminate the state of emergency declared by the President on May 1, 1985 as required by 50 U.S.C. § 1622(b). However, plaintiffs do not raise this claim in their complaint. Also, the consequence of congressional inaction is not addressed within the statute. Consequently, the court does not rule on this claim.

**9.** The notice of termination appears to be self-executing. Article XXV of the FCN Treaty provides that either party may terminate the treaty "by giving one year's written notice to the other Party." Treaty, *supra* at 467.

**10.** Although not specified in their complaint, plaintiffs contend that the termination of the protection provided by the FCN Treaty's Articles V, VI, VII, IX, X, XII, XIII, and XIV will injure them. These provisions assure citizens from one country that the other country will afford them most favored nation status, i.e., no less than that afforded nationals from other foreign countries, with respect to access to the courts (Article V), the regulation of business and commercial travel (Articles VII and XIII), the acquisition and disposition of property (Article IX), the acquisition and maintenance of patents and trademarks (Article X), and the importation and exportation of goods (Article XIV). In addition, the FCN Treaty affords protection against the nationalization of property (Article VI), discriminatory taxes (Article XI) and exchange restrictions (Article XII).

**11.** Four justices held that the claim raised a political question. Justices Marshall and Powell concurred in the result, with Justice Powell explicitly rejecting the finding in the plurality opinion that the issue raised a political question. Three justices dissented: Justice Brennan rejected the holding of nonjusticiability, while Justices White and Blackmun would have set the matter for oral argument. Of those justices who expressed an opinion regarding whether the treaty termination issue raised a political question, four of the six found that it did. Accordingly, unless the instant case is distinguishable, that holding is controlling here.

Sheet & Tube Co. v. Sawyer, supra, a case in which the Court had reached the merits of a suit brought by private litigants contesting the President's authority to seize the nation's steel industry. Plaintiffs in the instant case argue that since their challenge to the President's action does not present a confrontation between Congress and the President regarding their respective powers, but rather seeks solely to redress injuries suffered by private parties allegedly caused by unconstitutional government action, Goldwater is inapplicable to this case.

However, the plurality opinion in Goldwater was not premised upon the status of the litigants. Indeed, whether an issue raises a political question goes to the nature of the issue not who raises it. In this case, as in Goldwater, the issue raised is whether the President can terminate treaties without the approval of the Senate or Congress. In Goldwater, the plurality found, "In light of the absence of any constitutional provision governing the termination of a treaty, and the fact that different termination procedures may be appropriate for different treaties ..., the instant case ... 'must surely be controlled by political standards.'" Goldwater, supra at 1003, 100 S.Ct. at 537 (Rehnquist, J. concurring), quoting Dyer v. Blair, N.D.Ill. 1975, 390 F.Supp. 1291, 1302, and therefore the challenge to the President's power vis-a-vis treaty termination raised a nonjusticiable political question. That holding is equally applicable here even though plaintiffs are private parties.[12] In light of Supreme Court precedent on this issue, we grant defendants' motion with regard to plaintiffs' challenge to the notice of treaty termination on the ground that this claim raises a nonjusticiable political question.[13]

Accordingly, defendants' motion to dismiss with respect to plaintiffs' challenges to the Nicaraguan trade embargo and the notice of termination of the FCN Treaty is granted and plaintiffs' motion for partial summary judgment on these claims is denied.

---

**12.** The fact that plaintiffs are private parties without the resources to redress their alleged injuries outside a judicial forum, however, does highlight the extent to which the adjudication of this issue is necessary to provide a definitive answer regarding the treaty termination power. The ultimate source of that power is the Constitution. Although the Constitution's silence in this area may presently subject the exercise of the treaty termination power to control by political standards, addressing the issues raised here would serve to "eliminate rather than create, multiple constitutional interpretations." Goldwater, supra 444 U.S. at 1001, 100 S.Ct. at 536 (Powell, J. concurring).

**13.** In light of this holding, the court does not reach the issue of plaintiffs' standing. We do, however, have some doubt as to whether the injuries allegedly stemming from the treaty termination are sufficiently "distinct and palpable" to confer standing. Warth v. Seldin, 1975, 422 U.S. 490, 501, 95 S.Ct. 2197, 2206, 45 L.Ed.2d 343. In contrast to their allegations concerning the embargo, plaintiffs do not allege that the treaty termination has or will deprive them of any rights due them pursuant to their contracts with Nicaraguan entities. Rather, they allege that the treaty termination will deprive them of the assurances provided by the FCN Treaty and expose their contracts to greater risk. The degree of risk, however, reflects only the probability of loss rather than loss itself. Although the risk associated with plaintiffs' ventures may increase because of the treaty termination, it is not clear that plaintiffs will sustain any losses as a result of that termination.